Rosa Maria Cristobal MIRANDA, et al.,
Plaintiffs, Appellees,

v.

Miguel Gimenez MUNOZ, et al.,
Defendants, Appellants.

Rosa Maria Cristobal MIRANDA, et al.,
Plaintiffs, Appellants,

v.

Miguel Gimenez MUNOZ, et al.,
Defendants, Appellees.

Nos. 84-1664, 84-1757.

United States Court of Appeals,
First Circuit.

Argued June 3, 1985.

Decided Aug. 27, 1985.

Jose E. Fernandez-Sein, Santurce, P.R., with whom Harvey B. Nachman, Maria H. Sandoval and Nachman & Fernandez-Sein, Santurce, P.R., were on brief for Rosa Maria Cristobal Miranda.

Doris Zoe Pons-Pagan, Asst. Sol. Gen., Dept. of Justice, San Juan, P.R., with whom Americo Serra, Acting Sol. Gen., San Juan, P.R., was on brief for Miguel Gimenez Munoz.

Before COFFIN, BOWNES and DAVIS,* Circuit Judges.

COFFIN, Circuit Judge.

These appeals follow a jury trial of a Civil Rights action under 42 U.S.C. § 1983. Plaintiffs are the mother and brother of a 19-year-old epileptic who became critically ill while committed to the Arecibo District Jail as a pre-trial detainee and who died three days after being transferred to a local hospital. Plaintiffs alleged that a group of defendants exhibited "deliberate indifference" toward the decedent's medical needs, thus inflicting cruel and unusual punishment upon him in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The jury returned a verdict against three defendants—the jail's doctor, warden and assistant warden—and awarded a total of $50,000 in damages against them. Four other defendants, all supervisory officials in the Puerto Rico correctional system, were granted directed verdicts at the close of evidence. Plaintiffs appeal from the district court's decision to remove these four defendants from the case, and the remaining defendants appeal from a denial of their motion for judgment notwithstanding the verdict. After a careful review of the testimony presented at trial and the relevant legal principles, we conclude that the district court properly denied judgments n.o.v. in favor of the defendants found liable but improperly granted directed verdicts for the other four defendants. We thus remand for a new trial on their liability.

### I. Denial of Judgment Notwithstanding the Verdict

The principles governing our review of the denial of a motion for judgment n.o.v. are well established. We may not consider credibility, resolve conflicts in testimony, or evaluate the weight of the evidence. Judgment n.o.v. should be granted only when the evidence could lead reasonable persons to but one conclusion. *Fishman v. Clancy,* 763 F.2d 485, 486 (1st Cir.1985); *Cazzola v. Codman & Shurtleff, Inc.,* 751 F.2d 53, 54 (1st Cir.1984); *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 989 (1st Cir.1978). We must view the evidence and the inferences fairly drawn from it in the light most favorable to the prevailing party. *Fishman,* 763 F.2d 485, 486.

We thus turn to the evidence. Carlos A. Rosario Cristobal was a 19-year-old man who had suffered from epilepsy and mental illness for a number of years. He took medication to control his epileptic seizures and psychiatric problems, and had spent the last two months of 1979 in the Forensic Psychiatric Ward of the Rio Piedras Medical Center. After his discharge from that facility, Rosario Cristobal resumed his previous outpatient treatment at the Manati Mental Health Center. His last recorded visit there was on March 6, 1980, the day before he was committed to the Arecibo District Jail when he was unable to post bail on a charge of aggravated assault.

Rosario Cristobal received no medical attention at the Arecibo District Jail through the weekend following his arrival on Friday. On Monday, March 10, a lawyer retained by his mother called the prison and informed Warden Jose A. Candelaria Alonso of Rosario Cristobal's maladies. Warden Candelaria Alonso then asked Dr. Pedro A. Mora Boneta, a physician who worked at

* Of the Federal Circuit, sitting by designation.

the prison eight hours per week, to examine Rosario Cristobal. Dr. Mora Boneta, whose specialty was obstetrics and gynecology, prescribed two types of medication for him, but did not prescribe phenobarbitol, a drug Rosario Cristobal had been taking to control seizures. A medical expert for plaintiff testified that an abrupt stop of phenobarbitol could trigger a life-threatening condition known as status epilepticus, in which the person could experience repeated seizures. Dr. Mora Boneta gave Rosario Cristobal the first dosage of the medication he prescribed, but there are no records indicating that the decedent received any further medication at the jail. The responsibility for distributing medications at that time rested with the supervising prison guard on duty because the jail's full-time nurse, who usually administered drugs, was not working in March due to an accident. Although Rosario Cristobal told Dr. Mora Boneta that he had been receiving treatment at the Manati Mental Health Center, and plaintiffs' attorney had told Warden Candelaria Alonso that Carlos was receiving psychiatric treatment, no one called the Health Center for information about Rosario Cristobal.

Also on Monday, March 10, the decedent's mother, Rosa Maria Cristobal Miranda, went to the prison with her son's medication. She was not allowed to enter because it was not a visiting day. The guard at the gate took the pills from Mrs. Cristobal Miranda, but there is no indication in the record that Rosario Cristobal received them. She again brought medication to the hospital on Saturday, March 15, a visiting day, but was not allowed to give it to her son. During that visit, Rosario Cristobal told his mother that he had received no medication and was having seizures.

As a result of his examination of Rosario Cristobal on March 10, Dr. Mora Boneta

had advised Warden Candelaria Alonso to schedule an appointment for Rosario Cristobal at the Forensic Psychiatric facility "as soon as possible". An appointment was made for March 20. On the morning of March 20, as Rosario Cristobal was in the van and about to be transported to the psychiatric facility, he suffered an epileptic seizure and was taken to the Arecibo District Hospital rather than to his scheduled appointment. He received an injection of anti-convulsant medication and apparently also received some treatment for a bruised eye which he suffered during the seizure in the van. He was then returned to the jail and, according to prison records, suffered a second seizure later the same day. There is no indication that anyone attempted to reschedule the appointment at the psychiatric facility.

Dr. Mora Boneta, who was not at the jail on March 20, a Thursday, because it was his day off from that job, was told the next day that Rosario Cristobal had suffered two seizures. The doctor testified that he later observed Rosario Cristobal from a distance, but never performed a follow-up examination at close-range. No follow-up notes at all appear in Rosario Cristobal's prison medical record.

Prison records show that on March 24, Rosario Cristobal suffered another seizure. On March 25, a local judge issued an order directing that Rosario Cristobal be transferred from the Arecibo Jail to the Forensic Psychiatric facility. There is some dispute in the record as to whether Rosario Cristobal actually was taken to the facility on that day or whether prison officials merely communicated with the hospital by telephone,[1] but the evidence established unequivocally that no beds were available for other than emergency patients and the prison officials were told to try again the next day.

---

**1.** Defendants presented testimony that Rosario Cristobal was taken to the facility and that Dr. Frank Benitez refused him admission because he was not an emergency patient. Benitez testified, however, that he could find no notation indicating that he had examined Rosario Cristobal, that he always made such notes on patients he examined and that the lack of notation caused him to doubt whether he had seen the decedent. Benitez also testified that if he had been told that Rosario Cristobal had suffered two seizures on March 20 and another seizure on March 24, he would have found a bed for him as an emergency patient.

During the night of March 25 through the morning of March 26, Rosario Cristobal suffered a series of seizures. He was taken to the Arecibo District Hospital early on the morning of March 26 and was in a semi-comatose state when admitted. He failed to respond to treatment and the next afternoon was transferred to the larger Arecibo Regional Hospital. He died there two days later, and his medical records listed his final diagnosis as "status epilepticus."

■ In order to establish that medical mistreatment constitutes a violation of the Eighth Amendment, a prisoner must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs", *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). We have observed previously that " '[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law' ", *Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir.1981) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976)). We declined to hold, however, "that treatment received may never be 'so clearly inadequate as to amount to a refusal to provide essential care' ", *Layne v. Vinzant*, 657 F.2d at 474 (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir.1974)).

■ We think the jury properly could find this to be a case of medical attention so inadequate that it represented "deliberate indifference" on the part of the three defendants found liable. At least by March 21, the day after he suffered the first of his seizures, all three knew that Rosario Cristobal's epilepsy was not under control. Yet neither the jail doctor nor the warden or assistant warden apparently did anything to determine the precise cause of this attack or to prevent future ones. Defendants, it could reasonably be found, did not inadvertently fail to provide adequate medical care, *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291, or deny the decedent the right to the treatment of his choice, *Ferranti v. Moran*, 618 F.2d 888, 891 (1st Cir.1980). It could be found that defendants ignored a clear warning that the medical treatment they provided for Rosario Cristobal was inadequate, allowing him to deteriorate beyond recovery. We therefore uphold the district court's decision not to grant judgment n.o.v. for Dr. Mora Boneta, Warden Candelaria Alonso and Assistant Warden Vargas Maldonado.[2]

## II. Grant of Motion for Directed Verdict

It is proper to direct a verdict in a case only when "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there is only one verdict reasonable men could reach", *Harrington v.*

---

**2.** Although all three defendants had knowledge of Rosario Cristobal's condition at least by the time of his first attack, defendant Efrain Vargas Maldonado, the assistant warden, apparently had less direct contact with the decedent's case. The others, for example, knew on March 10 that Rosario Cristobal was an epileptic and had been receiving psychiatric treatment. It was also more directly their responsibility to follow up on his treatment. Nevertheless, Vargas Maldonado learned of Rosario Cristobal's condition on March 20, and he could have taken action after that time to assure that the decedent received adequate medical care. Although he was subordinate to Warden Candelaria Alonso, his position in the hierarchy does not insulate him from liability. *See Clark v. Taylor*, 710 F.2d 4 (1st Cir.1983) (warden who had no supervisory authority over state police officers who adminis-

tered benzidine test to plaintiff nevertheless liable for failure to intervene to prevent the test); *Putman v. Gerloff*, 639 F.2d 415 (8th Cir.1981) (deputy could be liable for failing to intervene to prevent sheriff from unlawfully punishing a prisoner).

We also note that under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), these defendants were not entitled to invoke the doctrine of qualified immunity. There is no question that the Eighth Amendment right at issue was clearly established by the time Carlos was incarcerated at Arecibo District Jail, *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See also Stathos v. Bowden*, 728 F.2d 15, 20 (1st Cir.1984) (*Harlow* instruction unnecessary when law is clear, in this case that public officials may not discriminate on basis of sex.)

*United States,* 504 F.2d 1306, 1311 (1st Cir.1974); *Brady v. Southern Railway Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943); *United States v. Articles of Drug Consisting of the Following: 5,906 Boxes,* 745 F.2d 105, 112–13 (1st Cir.1984); *Trinidad v. Pan American Airways, Inc.,* 575 F.2d 983, 984 (1st Cir. 1978). The trial judge must review the testimony most strongly against the moving party. If there is doubt, the case should go to the jury. The same standard is to be applied by the reviewing appellate court. *Harrington,* 504 F.2d at 1312.

The district court in this case gave no explanation for its decision to grant a directed verdict in favor of the four officials of the Puerto Rico Correctional Administration.[3] Perhaps it thought that these defendants could not be found liable because their asserted lack of knowledge of the specific incident involving Rosario Cristobal meant they had no duty to him. The fact that the court described its action as a dismissal of the complaint suggests this is so. It also could be, however, that even if there were a duty, the court believed that the evidence as a matter of law fell short of establishing that these defendants exhibited deliberate indifference to Rosario Cristobal's needs. We ought not, however, be required to speculate and, in other circumstances, would be forced to remand for a statement of the court's reasoning. We shall confront the matter without the benefit of such an explanation, however, because in either case a new trial is necessary for these defendants.

█ Because there is no *respondeat superior* liability under § 1983, *Pinto v. Nettleship,* 737 F.2d 130, 132 (1st Cir.1984); *Layne v. Vinzant,* 657 F.2d at 471; *Kostka v. Hogg,* 560 F.2d 37, 40 (1st Cir.1977), supervisory officials may be found liable only on the basis of their own acts or omissions. Supervisors need not have actual knowledge of the specific incident at issue, however, if they had the power and duty to alleviate the conditions which led to the violation, *Pinto v. Nettleship,* 737 F.2d at 132–33; *Fernandez v. Chardon,* 681 F.2d 42, 55 (1st Cir.1982). We agree with the description of supervisory liability given by the Fourth Circuit in *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir.1984):

> "The outer limits of liability in any given case are determined ultimately by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked."

In *Pinto v. Nettleship,* 737 F.2d 130, we upheld a ruling of summary judgment in favor of the superintendent of the Bayamon Regional Jail in a damages action brought by the parents of a pretrial detainee. The decedent was killed by an unknown inmate on the second day of his detention. We noted in *Pinto* two points significant to our disposition of this case. First, we observed that "personal liability in damages under section 1983 cannot be based on prison conditions beyond the control of a defendant". *Id.* at 133. And, second, we noted that where conditions such as overcrowding "may be endemic to an entire system, it is difficult to say that overcrowding in a single institution demonstrates, without more, the personal culpability of a local administrator". *Id.*

█ In this case, the defendants whose liability we are considering are responsible for administration of the entire prison system, not just of a single institution. In addition, Puerto Rico law provides that the Correctional Administration shall have the duty and power

> "[t]o establish programs to offer *adequate* medical care and hospital services intended to prevent diseases and the diagnosis, treatment and rehabilitation of the patient.
>
> The services may be furnished, whenever the circumstances so require, outside Administration facilities under the necessary security measures.

---

**3.** In an order dated August 28, 1984, the court issued a "partial judgment" in which it ordered that the complaint be dismissed as to these four co-defendants. Because this action came after a full trial, apparently in response to a pending motion for directed verdict, and because the court previously had denied a motion for judgment on the pleadings, we assume that the court intended its order to be viewed, in effect, as a grant of a motion for directed verdict.

*Detailed records* of medical examinations and the health condition of the patient shall be kept (emphasis added)". P.R. Laws Ann. tit. 4, § 1112(f) (1978).

We believe a jury could have found that each of the four defendants was charged with carrying out this mandate, and that each thus had the duty to ameliorate the medical conditions which led to Rosario Cristobal's death. *See Fernandez v. Chardon*, 681 F.2d at 55 ("Defendant will be liable for failures to meet his statutory responsibilities that amount to constitutional violations", citing *DiMarzo v. Cahill*, 575 F.2d 15, 17–18 (1st Cir.1978)); *cf. Pinto v. Nettleship*, 737 F.2d 130 (no statutory duty established). Certainly, Irba M. Cruz de Batista, the director of the Correctional Administration, had such a duty. Jorge Rodriguez Fraticelli and Cirilo Castro Penaloza were the director and deputy director of the penal institution program, whose functions included establishing programs to offer adequate medical care and hospital services for inmates. Porfirio Diaz Delgado, the coordinator of medical services, had a day-to-day responsibility to ensure that adequate medical services be provided to all inmates. These officials' testimony about their job functions further suggested that they had the power to make needed changes. Even as to Diaz Delgado, who occupied the lowest rung on this official ladder, both he and his superior, Rodriguez Fraticelli, testified that he had the authority to work out a remedy when he saw deficiencies in medical treatment.

■ Moreover, we can not say as a matter of law that the circumstances surrounding Rosario Cristobal's death represented a "sporadic incident[ ]" over which these officials " 'might properly claim to have no knowledge or control' ", *Layne v. Vinzant*, 657 F.2d at 471 n. 3. (quoting *DiMarzo*, 575 F.2d at 17). The testimony at trial indicated that the conditions surrounding Rosario Cristobal's medical treatment were as much a matter of central administration policy as of local reaction to his particular case. For example, Dr. Mora Boneta's contract providing for only eight hours per week of doctor care for an average population of 235 inmates was executed with the central administration and not with the Arecibo District Jail. Diaz Delgado testified that he knew that Arecibo's only full-time medical worker, the nurse, was absent and that he had started arranging for a substitute. He was unclear about the outcome of his efforts. Both Rodriguez Fraticelli and Diaz Delgado knew that the commonwealth's prisons had no special treatment plan for epileptics, and acknowledged that such a program was needed. Dr. Benitez testified that prisoners often arrived at his hospital, as in Rosario Cristobal's case, without proper medical records, and jurors could have attributed this to the defendants' failure to secure adequate compliance with the statutory mandate that detailed medical records be kept. In short, there was sufficient evidence to suggest that Rosario Cristobal's treatment was not an unexpected aberration from the normally adequate medical care provided in Puerto Rico's prisons, but an extreme example of the routinely poor conditions there. As such, these four defendants could be held liable for his death.[4]

■ Although we have little trouble in determining that a reasonable jury could have found power and duty on the part of these defendants, we believe it is a much closer case on the issue of their deliberate indifference to Rosario Cristobal's medical needs. Rodriguez Fraticelli, Cruz de Batista and Diaz Delgado all testified that they were attempting to improve medical conditions in Puerto Rico's prisons, and Castro Penaloza's testimony suggested that his failure to act may have been based on the good faith belief that others were taking care of the problems. Yet, we can not say as a matter of law that no jury would have imposed liability on these officials, whose credibility is beyond our scrutiny. Each had been in office for some time before Rosario Cristobal's detention at Arecibo

---

4. This is not a case in which it is inconsistent to find liability on the part of *both* the local prison officials and the central prison administration. A jury could have found that it was the combination of conditions authorized by the Correctional Department and specific actions taken by the Arecibo Jail officials which caused plaintiffs' injury. *Cf. Pinto v. Nettleship*, 737 F.2d 130.

Jail, and yet conditions arguably were still inadequate. A jury could well decide that each bore some responsibility for contracting with a specialist in obstetrics and gynecology to provide only eight hours of medical care per week for 235 prisoners, and that this was sufficient in itself to establish the deliberate indifference of each of them to the special needs of an epileptic patient like Rosario Cristobal. We therefore conclude that the directed verdicts must be reversed, and the case remanded for a new trial on the issue of these four defendants' liability.

*The partial judgment of the district court directing a verdict in favor of four defendants is vacated, and the cause remanded for further action. The order of the district court denying judgments notwithstanding the verdict for the other three defendants is affirmed.*