Elba N. ALVAREZ KERKADO, etc.,
et al., Plaintiffs,

v.

Dr. Mercedes OTERO de RAMOS, indi-
vidually, and in her capacity as Admin-
istrator of the Correctional Administra-
tion of the Commonwealth of Puerto
Rico, et al., Defendants.

Civ. No. 87–0196 GG.

United States District Court,
D. Puerto Rico.

Sept. 6, 1988.

Law Firm of Nachman & Fernandez–
Sein, Santurce, P.R., for plaintiffs.

Hector Rivera Cruz, Secretary of Justice,
Pedro A. Del Valle Ferrer, Director, Feder-
al Litigation Div., Dept. of Justice, San
Juan, P.R., for defendants.

## OPINION AND ORDER

GIERBOLINI, District Judge.

This is a civil rights action requesting
damages for certain constitutional viola-
tions which resulted in death. Decedent
Juan Bautista Andino Delgado, an inmate
at the Río Piedras State Penitentiary in
Puerto Rico, was killed by other inmates on
February 10, 1986. The plaintiffs in this
action are the children of the decedent.
They brought this action under 42 U.S.C.
§ 1983 against four defendants, each of
whom is or was an official in the Puerto
Rico prison system: Dr. Mercedes Otero de
Ramos, Administrator of Corrections; Dr.
Miguel A. Poupart Cuadrado, Director of
the Program of Penal Institutions of the
Administration of Corrections and Deputy
Administrator for the Treatment Area;
José A. Colón Guzmán, the Superintendent
of the Río Piedras State Penitentiary; and
José A. Cordero Padró, Commander of the
Guards at said institution at the time of the
acts subject of the complaint. Plaintiffs
allege that defendants' actions or inaction
resulted in the violation of decedent's con-
stitutional rights which ultimately caused
his death.

Defendants have filed a motion sup-
ported by six affidavits requesting the en-
try of summary judgment in their favor on
the grounds that plaintiffs have failed to
raise a genuine issue of material fact re-
garding defendants' personal responsibility

or involvement in decedent's death, or their deliberate indifference to decedent's security needs; that the decedent authorized defendants to remove him from voluntary isolation where he was being held for his own safety and to integrate him with the general penal population thereby releasing the correctional authorities from responsibility regarding any verbal or physical aggression he could suffer; and that defendants were shielded from the present suit by qualified immunity. Plaintiffs have filed an opposition and defendants have replied.

Under Rule 56(c) of the Federal Rules of Civil Procedure summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *General Office Products v. A.M. Capen's Sons, Inc.*, 780 F.2d 1077 (1st Cir.1986). However, the mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

The theory of liability set out in plaintiffs' complaint, to which defendants as the moving parties were required to respond, is alleged in several paragraphs of the complaint in material part as follows:

11. The decedent's death was caused by a denial of security and protection ...

14. The acts of the defendants ... do not constitute an isolated incident, but are part of a pattern of conduct of deliberate indifference to the decedent's needs for his personal safety and protection, in violation of the Fifth, Eighth and Fourteenth Amendments to the Constitution ... as evidenced by a complete breakdown of authority and control at the Río Piedras State Penitentiary.

24. On or before February 10, 1986, the defendants knew that the conditions of overcrowding, and the attacks and murders of inmates by other inmates, constituted a reign of terror and violence which endangered the lives of all the inmates at the Río Piedras State Penitentiary ...

25. During the past five years prior to February, 1986, the Río Piedras State Penitentiary had been the stage for widespread violence between prisoners and ... several riots had erupted. At various times these violent encounters resulted in the death of several inmates ...

26. During the past five years prior to February, 1986, the Río Piedras State Penitentiary had been plagued with the existence of rival prisoner gangs which vied for power within the institution. This rivalry resulted in the maiming and killing of either neutral inmates or members of the weakest gang. At the State Penitentiary a committee had been organized by the inmates to hold mock trials ... and to execute those inmates found "guilty" ... On or about February, 1986, the prisoners' gangs were in control of the Río Piedras State Penitentiary and this was known by and acquiesced too (sic) by the custody officers, including the defendants.

27. ... on or about February, 1986, at the Río Piedras State Penitentiary, was evidencing the following long standing and uncorrected conditions which directly affect the security of the inmates:

a. A lack of prisoner classification system;

b. Mixing of prisoners who should have been separated from each other ...

c. Severe overcrowding.

28. The defendants were all aware of these short comings (sic) and deficiencies ... Defendants further knew that these conditions particularly the crowding situation, was violative of this court's prior order issued on September 5, 1980 in

*Morales Feliciano v. Romero Barceló,* No. 79–4(PG) ... Each of the defendants had, within their own sphere of responsibility, control over the conditions ... which affected the security of the inmates, but failed to take any action to correct these conditions. Defendants' actions or inaction amounted to deliberate indifference to decedent's need for protection and security.

29. On February 10, 1986, decedent ... was brutaly (sic) murdered by his fellow inmates and his body was cut into small pieces which pieces ... were placed in a garbage pail which contained fodder for the hogs ...

30. The death ... was caused by the lack of reasonable protection and security at the Río Piedras State Penitentiary ...

Although plaintiffs have filed an opposition to the motion for summary judgment, they have not submitted counteraffidavits or any other supporting documentation pointing to specific facts which are contested. *See* Fed.R.Civ.P. 56(e). Instead, plaintiffs rely upon the argument that history shows there was a serious breakdown of prison authority and control, an inadequate prisoner classification system, the lack of a prisoner identification system, severe overpopulation, lack of security devices, mixing of violent and nonviolent prisoners, as well as sentenced and pretrial detainees and other conditions over which defendants may have exercised control and authority. Plaintiffs contend that since the decedent was a member of the plaintiff class in *Morales Feliciano,* the findings of fact and conclusions of law entered in that case operate as an issue preclusion and/or collateral estoppel, and that the issue of deliberate indifference has been precluded by the orders issued in that case. Plaintiffs also attack the validity of the waiver of liability signed by the decedent.

At the outset, we note that liability in damages can only be imposed upon officials who were involved personally in the deprivation of constitutional rights since there is no *respondeat superior* liability under section 1983. *Miranda v. Muñoz,* 770 F.2d 255, 260 (1st Cir.1985); *Pinto v. Nettleship,* 737 F.2d 130, 132 (1st Cir.1984); *Kostka v. Hogg,* 560 F.2d 37, 40 (1st Cir.1977). Although a supervisory official need not have actual knowledge of the specific incident at issue, if he had the power and duty to alleviate the conditions which led to the violation, he may be found liable. *Miranda, supra,* 770 F.2d at 260; *Pinto, supra,* 737 F.2d at 132–33; *Fernández v. Chardón,* 681 F.2d 42, 55 (1st Cir.1982).

In *Pinto,* the court noted that "personal liability in damages under section 1983 cannot be based on prison conditions beyond the control of a defendant." *Id.* at 133. The court also observed that where conditions such as overcrowding "may be endemic to an entire system, it is difficult to say that overcrowding in a single institution demonstrates, without more, the personal culpability of a local administrator." *Id.* In *Pinto,* the court upheld the granting of summary judgment in favor of a jail superintendent in a section 1983 action seeking damages for the death of a prison inmate. In so doing, the court found that defendant did not control the number of guards nor could he refuse to admit inmates, and had done what he could to obtain more guards to alleviate the crowding. Since plaintiffs did not adduce any proof that the superintendent could have done more than he did, as a jail official he could not be held liable in a section 1983 action for conditions beyond his control.

In *Cortés Quiñones v. Jiménez Nettleship,* 773 F.2d 10 (1st Cir.1985) which is more similar to the case at bar, plaintiffs' complaint made reference to more than overcrowding and insufficient guards. There plaintiffs also complained, *inter alia,* of an inadequate system of classifying inmates, a history of attacks and murders, gang wars, and the failure to station guards in the interior of cell blocks. The court observed that "[a]t least some of these problems could be inferred to be matters over which individual defendants exercise control." *Id.* at 13. As here, plaintiffs' action was not limited to the superintendent; it also named the person in charge of security and the Administrator of Corrections as defendants. Although plain-

tiffs failed to oppose defendants' motion for summary judgment, the court found that defendants' perfunctory nine or ten sentence affidavits were insufficient to establish the absence of any genuine issue of material fact regarding defendants' responsibility for or control over the conditions complained of, and thus summary judgment was not warranted.

In the absence of any counteraffidavits or other supporting documents of the plaintiffs, the question here, as in *Cortés Quiñones,* is whether defendants' affidavits sufficiently respond to the theory of liability expounded in plaintiffs' complaint and demonstrate the absence of any genuine issue of material fact.

In the case at bar, in contrast to *Cortés Quiñones,* defendants' affidavits submitted in support of their motion for summary judgment are extensive and detailed. Defendant Cordero, Commander of the Guard at the State Penitentiary, stated that he had not been notified that there was any threat to decedent's safety which required the taking of special security measures; that the standing orders issued for security were being carried out under his supervision; that there were four Custody Officers' shifts daily in the State Penitentiary, each shift comprised of one lieutenant, one or two sergeants and approximately thirty-five to forty Custody Officers; that a guard was assigned to each of the four cabins located in each floor, but that the guards could not see inside the cells unless they left the cabins and stood in the hallway in front of a particular cell; that the cells' electronic locking mechanism had been vandalized by the inmates and was inoperative on February 10, 1986 so the inmates could move freely in and out of the cells and in the hallway within the quadrant; that Andino Delgado's death was due to circumstances beyond his control; that he did not tolerate violent rivalries between groups of prisoners and took every preventive measure possible, including the separation of violence prone individuals or groups.

Defendant Colón Guzmán, the Superintendent of the Río Piedras State Penitentia-ry, stated he had begun to act as Superintendent on December 30, 1985, only forty (40) days before decedent was killed; that decedent's dormitory and working assignments were arranged before he commenced work at the penitentiary and he saw no need to change them since decedent was living uneventfully within the prison's general population and there was no indication that anything unusual would happen; that he did not receive notice that there was any threat to decedent's safety, but rather the records in his custody reflected that decedent was being kept in voluntary isolation for his own safety and had requested to be reintegrated to the general prison population stating that he did not have any problem with anyone there; that the intermingling of prisoners was due to the prisoners' vandalizing of the cells' electronic locks which had been previously repaired and were vandalized again; that Andino Delgado's death was due to circumstances beyond his control; that he had reported the problem of overcrowding to his supervisors and the lack of possible solutions short of a massive transfer of inmates to other institutions which were non-minimum security and were also overcrowded; and that he did not tolerate violent rivalries between groups of inmates and took every preventive measure, such as transferring inmates.

Defendant, Dr. Poupart Cuardrado who was Deputy Administrator in charge of Corrections at the time of decedent's death, expressed that he did not have the responsibility of evaluating each inmate prior to his confinement in a particular institution; that he was not personally involved in determining where Andino Delgado was to be confined; that he was not notified of any threat to Andino Delgado's safety within that institution; that he did not consider the need for a transfer of Andino Delgado since no incident was brought to his attention which required a change in decedent's place of confinement; that the death of Andino Delgado was due to factors beyond his sphere of responsibility and control; and that the Corrections Administration has an inmate classification system which takes into account numerous factors such as the inmate's mental and emotional condi-

tion, his aggressiveness, his escape history, etc.

Defendant Otero de Ramos, the Administrator of Corrections, stated that the Río Piedras State Penitentiary was reconditioned around 1982 and modern electronic locks were installed in the cells; that said locks were vandalized on more than two occasions by the inmates, and consequently she ordered that the gates be soldered on; that the vandalized gates could not be closed and therefore the inmates could move freely within their area; that due to a suit filed in the Ponce Superior Court the recruitment of Custody Officers was temporarily stopped; that she must comply with a court order to incarcerate a person and cannot transfer new arrivals to other less secure institutions, even if they are less crowded, until the inmate shows that he can be trusted in a less restrictive environment; that the other non-minimum security institutions are also overcrowded; that she had been in her position only eight (8) months before decedent's death which is not sufficient time to solve the overcrowding that has prevailed for many years; that she had inherited her predecessor's budget with its priorities; that to the extent these factors contributed to decedent's death, the death was due to circumstances beyond her control; that she did not receive any information prior to Andino Delgado's death of a threat to decedent's safety, but to the contrary the records of the Corrections Administration show that for his own security he was being kept in isolation and that he requested to be integrated to the general prison population stating there was no risk of harm; that she was not personally involved in determining Andino Delgado's place of confinement; that at the time of decedent's death there was no reign of terror and violence at the State Penitentiary, his death being an isolated incident, having occurred only two violent deaths between July 1982 and June 1985, and none in the four months preceding the death; that violent rivalries between groups of prisoners were not tolerated and every preventive measure possible was taken; that her pattern of conduct reflects due care in the discharge of her duties, including the provision of reasonable security for the inmates by obtaining an increase in the Administration's budget for 1986–87 of $64,325.047 and another for 1987–88 of $83,479.031; that after the court lifted its prohibition previously mentioned above, 1065 additional Custody Officers were hired in 1986 and 1253 places for additional inmates were constructed, and that she does not assign the duties to the Custody Officers, but only determines within the available resources how many Custody Officers will be assigned to each institution on the basis of their needs.

Daniel Ocasio Torres, not a defendant here, also submitted a sworn statement to the effect that on May 31, 1985 he was on a special shift as Correctional Officer in the Intensive Treatment Unit (U.T.I.) in the State Penitentiary and that he witnessed the proceedings regarding the request made by Andino Delgado to be released from voluntary isolation into the general prison population. He also stated that at that time Andino Delgado expressed he did not anticipate any personal safety problems should the request be granted; that Andino Delgado signed a document authorizing the penal authorities to integrate him into the general penal population and releasing the authorities from responsibility for any physical or verbal aggression he might suffer as a result; that Ocasio Torres and another witness signed the document, and that the request was granted since there was no apparent threat to Andino Delgado's safety.

▪ Upon careful scrutiny of each affidavit submitted by the defendants, we find that plaintiffs' allegations refer to conditions which were either beyond defendants' control or, if within their control, they took every measure to alleviate these conditions. Although the conditions alleged by plaintiffs might be considered endemic to an entire system, we cannot state that these conditions in a single institution demonstrate, without more, the personal culpability of each of the defendants. Particularly where, as here, plaintiffs have failed to indicate any personal action or inaction by the defendants within the scope of their

responsibilities which would subject them to personal liability under section 1983. Plaintiffs have rested on mere general allegations and have failed to call to our attention any specific facts regarding defendants' conduct that would create a genuine issue for trial. *Cf. Pinto, supra.*

■ Finally, plaintiffs contend that the findings of fact and conclusions of law concerning the problems facing the entire penal system found in *Morales–Feliciano v. Carlos Romero Barceló*, 497 F.Supp. 14 (D.P.R.1980) operate as an issue preclusion and/or collateral estoppel against defendants so that they cannot escape liability through qualified immunity, except that each defendant may show on an individual basis that he or she had no control or authority over the conditions which led to the constitutional violation. Plaintiffs allege that defendants had knowledge of these aggravated conditions at the State Penitentiary by their daily involvement with these conditions or because they were placed on notice by the court's decree and that they acted with deliberate indifference to these violations of the decree.

It is uncontested that there was overcrowding not only at the State Penitentiary but in the total Corrections system, lack of penal personnel and limited economic resources. Furthermore, at least defendant Otero, the Administrator of Corrections must have known of the federal court decree finding the entire prison system unconstitutionally unsafe.

Likewise, it is well-established that deliberate indifference to a prisoner's health and safety violates the eighth amendment. *See e.g. Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Layne v. Vinzant*, 657 F.2d 468 (1st Cir.1981). "[P]rison officials have a duty under the 8th and 14th amendments to protect prisoners from violence at the hands of other prisoners." *Leonardo v. Morán*, 611 F.2d 397, 398–99 (1st Cir.1979); *accord Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986). When prison officials intentionally place prisoners in dangerous surroundings or when they are deliberately indifferent to prisoners' health or safety, they violate the Constitution. *See e.g. Layne, supra.*

However, the protections of the Due Process Clause are not triggered by the lack of due care or a negligent act by prison officials. In *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), an inmate sued prison officials seeking damages under 42 U.S.C. § 1983 for injuries suffered due to their failure to protect him from another inmate. In that case, plaintiff wrote a note alerting the authorities that he feared an attack. The Assistant Superintendent of the prison who received and read the note referred it to a Corrections Sergeant. The latter received the note, was informed of its contents and left it on his desk unread. By the time the Corrections Sergeant left the prison he had forgotten about the note and since neither of the two prison officials worked on the next two following days, the officers on duty at that time were never informed of the threat. On the second day following the threat, plaintiff was attacked with a fork, his nose was broken and wounds were inflicted to his face, neck, head, and body. Notwithstanding defendants' lack of due care which led to serious injury, the Court found that such conduct did not approach the kind of abusive government conduct that the Due Process Clause was designed to prevent. The Court expressed that "[t]he guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials." The Court cited in support of its decision the case of *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1985) where it held that the Due Process Clause of the Fourteenth Amendment was not implicated by the lack of due care of an official causing unintended injury to life, liberty, or property. Differently stated, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required. *Davidson, supra*, 474 U.S. at 347, 106 S.Ct. at 670.

Notwithstanding defendants' knowledge of a seriously deficient system, a court

decree, and prior law, the facts outlined above do not permit a finding of deliberate indifference which would preclude the assertion of a qualified immunity defense. *Cortés–Quiñones, supra.* Although defendants might be expected to have known about the system and the degree of importance they might be expected reasonably to have attached to the need to take certain measures within their control to alleviate these dangerous conditions, the facts show that defendants did not act with deliberate indifference or reckless disregard to decedent's safety. Quite to the contrary, defendants actively pursued all means within their control in an attempt to ensure the safety of the inmates.

Wherefore, in view of the foregoing, defendants' motion for summary judgment is hereby GRANTED and the present action is dismissed. The Clerk shall enter judgment accordingly.

SO ORDERED.