Ramos v. Hillsborough County          CV-89-214-M    03/21/97
                    UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW HAMPSHIRE

<u>Jesus Ramos</u>

     v.                                        Civil No. 89-214-M

<u>Hillsborough County, et al.</u>

                        **O R D E R**

     Jesus Ramos, appearing pro se, brings this civil rights
action pursuant to 42 U.S.C.A. § 1983, asserting that defendants'
treatment of him at the Hillsborough County Jail violated his
Fourteenth Amendment rights.  In the long course of this case,
several of Ramos's claims and many defendants have been
dismissed.  His remaining claims are that corrections officers
Robert LeBlanc and Paul Lemieux used excessive force in returning
him to his cell and that jail superintendent Frederick Cleveland
and nurse Madeline Desmarais were deliberately indifferent to his
serious medical needs.  All four defendants have moved for
summary judgment on grounds of qualified immunity.

                    **STANDARD OF REVIEW**

     Summary judgment is appropriate if the "pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If that burden is met, the opposing party can avoid summary judgment on issues that it must prove at trial only by providing properly supported evidence of disputed material facts that would require trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes of material fact create a trial worthy issue precluding summary judgment only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The court interprets the record in the light most favorable to the nonmoving party, the plaintiff in this case, and resolves all inferences in his favor. MacGlashing v. Dunlop Equipment Co. Inc., 89 F.3d 932, 936 (1st Cir. 1996).

## BACKGROUND

Jesus Ramos was being held in the Hillsborough County Jail in pretrial detention on September 16, 1986, when the incident involving corrections officers Robert LeBlanc and Paul Lemieux occurred. Ramos was assigned to the observation cell, the only cell in the tier that had a cigarette lighter. Inmates who smoked naturally tended to gather in the observation cell. Ramos

2

did not smoke, and wanted to be moved to another cell. During the early morning, LeBlanc passed the tier where Ramos's cell was located, and Ramos asked to be moved to a cell in the same tier that was vacant. LeBlanc supposedly entered the tier, grabbed Ramos by the throat, and began pushing him back into his assigned cell. Ramos says he did not touch LeBlanc, but grabbed the cell door so that he could not be pushed backwards into his cell. LeBlanc called for help, and Officer Lemieux responded from another tier. Lemieux allegedly kicked Ramos in the groin, grabbed him in a headlock, and threw him against the wall in his cell and onto the floor. Due to the commotion, other guards ran into the area and ordered all other inmates into their respective cells. LeBlanc and Lemieux locked Ramos in his cell. After LeBlanc and Lemieux had a chance to discuss the situation, LeBlanc is said to have returned to Ramos's cell, apologized to him, and moved him to the cell that he had originally requested.

The events that give rise to Ramos's second claim began two days later, on September 18, 1986, when Ramos notified the jail nurse about pain in his mouth and asked to see a doctor. Four days later, Dr. Collins examined Ramos and recommended a peroxide rinse and chloraseptic gargle to treat what appeared to be herpes lesions in his mouth. Dr. Collins continued the rinse treatment when he saw Ramos a week later. Dr. Collins saw Ramos again on

3

November 20 and noted evidence of self-inflicted sores but no infection.  The nurses' notes, which are somewhat difficult to read, suggest that by early December, Ramos's mouth condition was better, but the gums around his front teeth were inflamed.  Soon after, however, Ramos reported that his mouth condition was worsening despite the rinse and gargle treatment.  Ramos states that during this time his gums and mouth were bleeding excessively and when he went for medical attention, Nurse Desmarais would order him back to his cell without treatment, although Nurse Cunningham and others would allow him treatment.

On January 2, 1987, the doctor's note describes "irritable gums" and bleeding after excessive brushing and notes no gingivitis.  Ramos was given peroxide for rinsing and a soft toothbrush was recommended, which Ramos's family brought to him.  Ramos continued to have bleeding in his mouth and asked his attorney, Bruce Kenna, to intervene to help him get medical attention.  Ramos states that Kenna contacted the director of the jail, Frederick Cleveland, and through him arranged for Ramos to be examined by a dentist, Dr. Sweeney.  Ramos began treatment with penicillin and peroxide rinses prescribed by Dr. Sweeney on January 15.  Ramos states that Dr. Sweeney recommended surgery if the course of penicillin did not cure his condition, but that Cleveland decided against surgery and told Ramos he could wait

4

until he was convicted and sentenced to have surgery when he was moved to the state prison.

The record of doctor's orders indicates that penicillin was again prescribed for Ramos in February along with a continuation of peroxide rinses. Ramos's medication bills suggest that he continued to use penicillin through March. Ramos stopped using peroxide rinses by the end of February and continued to ask to be examined by a dentist, which request was refused. Psychology notes dated February 17, 1987, state that Ramos acknowledged that softer toothbrushes helped his mouth bleeding. Ramos was transferred to the New Hampshire State Prison on April 10, 1987. He asserts that the lack of proper medical attention to his mouth condition caused him to lose several teeth including all of his front teeth.

## DISCUSSION

Ramos contends that his Fourteenth Amendment rights were violated when Officers LeBlanc and Lemieux used excessive force in the September 16 incident, and when Director Cleveland and Nurse Desmarais acted with deliberate indifference to his serious need for medical treatment of his mouth condition. All four defendants have moved for summary judgment, asserting that they are entitled to qualified immunity from liability.

5

A government official is entitled to qualified immunity if the challenged "'conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Aversa v. United States, 99 F.3d 1200, 1214 (1st Cir. 1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The challenged conduct is measured by a standard of objective reasonableness, that is: "Could an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the plaintiff['s] constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?" Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996). A defendant does not lose the protection of qualified immunity if he acts mistakenly, as long as his mistake was objectively reasonable, as qualified immunity is intended to protect "'all but the plainly incompetent or those who knowingly violate the law.'" Veilleux v. Perschau, 101 F.3d 1, 3 (1st Cir. 1996) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The legal standard to be applied in a qualified immunity analysis is "the law in effect at the time of the alleged violation." Aversa, 99 F.3d at 1214. Thus, a defendant may be entitled to qualified immunity based on the legal standard applicable at the time of his actions, although his actions would

6

violate the current legal standard.  Id. at 1215.  The trial court also may bypass the qualified immunity analysis if the claim fails on the merits under current law.  Id..

**A.    Excessive Force**

Before September 1986, when the incident occurred in which Ramos alleges Officers LeBlanc and Lemieux used excessive force to return him to his cell, the law was clearly established that a pretrial detainee, like Ramos, had a Fourteenth Amendment right not to be subjected to conditions, including the use of force, that amounted to punishment.  See Bell v. Wolfish, 441 U.S. 520, 535-39 (1979).  To determine whether particular treatment constituted punishment:

> A court must decide whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].

Id. at 538 (internal quotations and citations omitted).  Maintenance of security, order, and discipline in a jail was an established and legitimate objective for correctional officers in 1986, id. at 540, and jail officials could lawfully punish pretrial detainees for violations of jail rules or procedures

7

without offending the Fourteenth Amendment, <u>Santana v. Collazo</u>, 714 F.2d 1172, 1180 (1st Cir. 1983), <u>cert. denied</u>, 466 U.S. 974 (1984). Nevertheless, at that time both the Eighth and Fourteenth Amendments were recognized as prohibiting the use force that was "shocking or violative of universal standards of decency." <u>Furtado v. Bishop</u>, 604 F.2d 80, 95 (1st Cir. 1979).

It was then also clearly established that, depending upon the circumstances, the unnecessary or unjustified use of force against a prisoner violated the Eighth Amendment. <u>Unwin v. Campbell</u>, 863 F.2d 124, 129 (1st Cir. 1988) (reviewing law applicable in 1986 and before). The Supreme Court held in early 1986, before the events in question here, that whether forceful prison security measures violate prisoners' Eighth Amendment rights depends on whether "'force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986) (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1084-85 (2d Cir.1973)). While the Fourteenth Amendment has long been interpreted to prohibit "'conduct that shocks the conscience' or 'affords brutality the cloak of law,'" the relationship between the prohibitions of the Eighth and Fourteenth Amendments in the context of the use of force in prisons has not been thoroughly explained. <u>See</u> <u>Whitley</u>, 475 U.S.

8

at 327 (quoting <u>Rochin v. California</u>, 342 U.S. 165, 172, 173 (1952)); <u>see also</u> <u>Wilson v. Williams</u>, 83 F.3d 870, 875 (7th Cir. 1996)(standards for Fourteenth Amendment protection of pretrial detainees from excessive force still vary among circuits).  Since the Fourteenth Amendment was interpreted to protect pretrial detainees from <u>any</u> punishment for unconvicted crimes, and not just from the type of cruel and unusual punishment prohibited by the Eighth Amendment, at a minimum, pretrial detainees were obviously entitled to Eighth Amendment protections.  <u>See</u> <u>City of Revere v. Massachusetts Gen. Hosp.</u>, 463 U.S. 239, 244 (1983).

In this case, then, the court must determine whether LeBlanc's and Lemieux's actions were objectively reasonable under the circumstances, judged in light of the constitutional standard applicable in 1986.  That is, could reasonable corrections officers in defendants' positions have understood that the force used was reasonable and rationally related to the stated purpose of maintaining jail security, discipline, and order, and that the force used was not excessive under the circumstances, or, conversely, was unreasonable force employed by defendants, maliciously and sadistically, and not for the purpose of restoring or maintaining order and discipline, but for the very purpose of causing harm?

9

### 1. Officer LeBlanc

Ramos contends, with support in the record from sworn declarations[1] from two inmates who witnessed the incident, that Officer LeBlanc attacked and choked him without provocation in response to his legitimate request to be moved to another cell. Ramos speculates that LeBlanc was personally hostile toward him because Ramos had been involved in a shooting incident with LeBlanc's cousin in 1979. Officer LeBlanc responds[2] that he believed Ramos threatened him when he declined to immediately move Ramos to another cell, that, in any event, Ramos refused to go into his assigned cell when ordered, and that Ramos resisted LeBlanc's efforts to physically move him into his cell, which required LeBlanc to call for help.

---

[1] Although the statements signed by Ramos's witnesses do not entirely comport with the form provided by 28 U.S.C.A. § 1746, each statement invokes the penalties of perjury, is dated, and cites the statute, evidencing a clear intent by a pro se litigant to provide a statement within the meaning of the statute. For purposes of this summary judgment motion, then, the two statements are deemed to substantially comply with § 1746 and thereby meet the affidavit requirement of Rule 56(e). See Goldman, Antonetti, et al. v. Medfit Intern., 982 F.2d 686, 689-90 (1st Cir. 1993).

[2] Officer LeBlanc's unsworn declaration contains an attestation that the statement is true and correct under penalty of perjury, and, although it is not dated, meets the substantive requirements of 28 U.S.C.A. § 1746. Goldman, Antonetti, 982 F.2d at 689-90.

If Ramos produces credible evidence of his distinct version of the incident at trial, a reasonable jury might find (depending of course on the jury's credibility determinations) that LeBlanc employed force against Ramos not "in a good faith effort to maintain and restore discipline" but "maliciously and sadistically" for the purpose of inflicting pain.  See, e.g., Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  One thing is clear in this case — a genuine dispute exists as to material facts — i.e. whether LeBlanc acted throughout for the legitimate purpose of forcing Ramos to return to his cell, or, acted without justification for the purpose of unnecessarily and wantonly inflicting pain.  Since no corrections officer in LeBlanc's position in September of 1986 could have reasonably believed that physically assaulting and choking a pretrial detainee was a constitutionally permissible use of force in the absence of a legitimate penological objective, and since the plaintiff and defendants disagree materially not only as to the critical facts related to the presence or absence of a legitimate penological objective, but also as to the nature and degree of force actually employed, summary judgment on the issue of qualified immunity is not available[3], and the availability of qualified immunity itself

_____

     [3]  The factual dispute in the present record concerning the purpose and context of LeBlanc's employment of force would also preclude summary judgment in LeBlanc's favor on the merits of

11

must await resolution of the factual disputes between prisoner and corrections officer(s). Accordingly, LeBlanc is not entitled to qualified immunity from liability as to Ramos's claim against him, at least not at this juncture.

### 2. Officer Lemieux

It is undisputed that Officer Lemieux responded to Officer LeBlanc's call for help. A reasonable officer in Lemieux's position would certainly have responded, reasonably, with force to help a fellow officer engaged in an apparent struggle with a prisoner. Ramos, however, contends that it was clear that he was not resisting LeBlanc but rather that LeBlanc was gratuitously assaulting him, so that Lemieux's employment of physical force (kick to the groin and bouncing him off walls) was necessarily excessive under the circumstances. Ramos and his two witnesses describe Ramos as holding onto his cell with both hands while LeBlanc choked him and tried to push him into the cell. Lemieux

_____

Ramos's claim. An intentional assault upon a detainee by a guard in the absence of a legitimate penological purpose would certainly violate the detainee's Fourteenth Amendment rights, whether measured by the Eighth Amendment's deliberate indifference standard or the Fourth Amendment's objective reasonableness standard. See Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994) and Graham v. Connor, 490 U.S. 386, 395 (1989); see also Wilson, 83 F.3d at 874-76.

recites no facts in his declaration, i.e. precisely what he saw; he merely states that he believed LeBlanc was being assaulted.

Despite the apparent dispute related to what LeBlanc perceived the situation to be, it seems evident that under the pressures of the moment a reasonable corrections officer in Lemieux's position should not be expected to instantaneously analyze with precision who is doing what to whom. Instead, Lemieux's obvious duty was to stop the disturbance by first assisting in subduing and controlling the apparently resisting prisoner by employing that degree of force reasonably necessary. Action taken by a corrections officer for that purpose, even if based on a mistaken or negligent interpretation of the circumstances, would not violate the Fourteenth Amendment. See Daniels v. Williams, 474 U.S. 327, 333-34 (1986). Ramos was, by his own account, grabbing onto the bars and resisting LeBlanc's efforts to physically force him into his cell. As Ramos provides no factual support for his conclusory assertion that Lemieux attacked him gratuitously, rather than in response to LeBlanc's urgent call for help, the obvious ongoing resistance, and the continuing struggle between officer and inmate he came upon, Lemieux's actions were objectively reasonable under then applicable constitutional standards, up to a point. Thus, Lemieux is entitled to qualified immunity from liability with

13

regard to his decision to assist LeBlanc and his physical intervention designed to overcome Ramos's resistance and force him into his cell by employing whatever force was reasonably necessary to accomplish that goal.

Ramos argues that Lemieux used excessive force in subduing him in that Lemieux kicked Ramos in the groin, grabbed him in a headlock, and began "throwing him against the walls" or "bouncing him against the walls." Ramos also stresses that he never fought against either officer. But Officer Lemieux was entitled as a matter of law to use reasonable force necessary to force Ramos into his cell in light of Ramos's refusal to comply and his demonstrated physical resistance. Force consisting of a blow to the groin and headlock intended to force Ramos to cease resisting, release his grip on the bars, and place him into the cell, falls well within the bounds of reasonable force under the circumstances, even as that force is described by Ramos. While Ramos says he never "fought" with either officer, neither did he let go of the bars and enter the cell when lawfully directed to do so — nor did he comply with the officers' physical efforts to get him into the cell.

However, while physical force is often necessary to control an angry and resisting inmate, once the inmate is subdued and under control, especially if he is no longer resisting or able to

14

resist, and the goal has been accomplished, additional force, in this case in the nature of throwing or bouncing the inmate against the walls, goes beyond the legitimate purpose of restoring order and discipline.

On the factual record presented here it is unclear whether, once Ramos was subdued and moved into his cell, Lemieux "began throwing him against the walls" or was "bouncing him against the walls" in a gratuitious and severe manner designed to inflict pain or punishment. This apparent factual dispute prevents a determination, as a matter of law, that a reasonable officer in Lemieux's position could have believed that his conduct comported with constitutional requirements, because, of course, a jury could (if it believes Ramos) conclude that behavior by Lemieux (as described by Ramos) was not related to a good faith effort to maintain discipline, but was maliciously and sadistically intended merely to inflict pain as punishment. Similarly, the disputed factual situation prevents a legal determination on the merits.

As material facts are in dispute, summary judgment on the issue of qualified immunity is necessarily denied at this stage on the claim that Lemieux used excessive force to subdue Ramos, at least until the underlying factual disputes are resolved.

Whether Ramos can make his case remains to be seen, but summary judgment on qualified immunity is not available because Ramos's allegations and supporting affidavits raise decidedly factual issues regarding what actually happened and what the officers' motivations were. Taking Ramos's allegations as true, as the court must at this stage, the force used went beyond de minimus. It is an unfortunately murky area of the law, littered with implausible tests that seemingly confound any realistic expectations on the part of corrections officers to obtain qualified immunity in excessive force cases — the legal reality seems to be that prisoner complaints of excessive force by and large will require trials on the merits to resolve the inevitable factual disputes that arise — only then can the entitlement to qualified immunity be determined. See, e.g., St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995), cert. denied, 116 S. Ct. 2548 (1996); Carter v. State of Rhode Island, 68 F.3d 9, 13 (1st Cir. 1995).

B. **Medical Treatment**

"Since at least 1983 there has been no doubt that a pre-trial detainee is entitled to medical attention for serious medical needs under the due process clause of the Constitution." Consolo v. George, 58 F.3d 791, 794-95 (1st Cir.), cert. denied,

16

116 S. Ct. 520 (1995). It was well-established in 1986 that deliberate indifference, rather than negligent or inadvertent failure to provide appropriate medical care, to a convicted prisoner's serious medical needs violated the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). While it remains unclear to what extent pretrial detainees may be entitled to greater protection than that afforded by the Eighth Amendment, at least deliberate indifference[4] by jail authorities to detainees' serious medical needs violated their constitutional rights. See Elliott v. Cheshire County, N.H., 940 F.2d 7, 10 (1st Cir. 1991); Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.), cert. denied, 500 U.S. 956 (1991).

Assuming that Ramos's mouth sores constituted a serious medical condition, he must show that, at some point between September 18, 1986, and April 10, 1987, Director Cleveland and

---

[4] In 1994, the Supreme Court redefined the deliberate indifference standard in the Eighth Amendment context to include a subjective component. Farmer v. Brennan, 114 S. Ct. 1970, 1977 (1994). Although the First Circuit has not yet decided the issue, several other circuits have determined that the Farmer deliberate indifference standard also applies to claims based on the Fourteenth Amendment brought by pretrial detainees. See Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 259-61 (7th Cir. 1996), petition for cert. filed, 65 U.S.L.W. (Nov. 12, 1996); Hare v. City of Corinth, Ms., 74 F.3d 633, 648-49 (5th Cir. 1996). Because Ramos argues that both Director Cleveland and Nurse Desmarais were aware of his need for medical care when they denied him treatment, the different standard would not make a significant difference if his claim were examined on the merits.

17

Nurse Desmarais demonstrated deliberate indifference to his need for medical treatment. Based on the record, however, Ramos undeniably received medical treatment for his mouth condition, though perhaps not the exact treatment of his choice. The medical records show that his medical condition fluctuated throughout the period, and that at times the doctors and nurses suspected that he was intentionally causing bleeding and sores in his mouth.

Ramos contends that Nurse Desmarais turned him away whenever she was on duty, but it is not clear from the record that his condition on those occasions required any further or any particular treatment beyond the rinses and medication already prescribed, which he was receiving. (A qualified medical professional's "turning away" a prisoner seeking additional or different medical treatment when he is already on a current medically directed treatment regimen for the very problem he is complaining about seems a perfectly reasonable response — the critical issue relates to the delivery of adequate medical care, not the delivery of medical care as demanded by lay prisoners.) And, even according to Ramos, Director Cleveland was made aware in January of 1987, of his medical needs and immediately had him seen by Dr. Sweeney, who recommended alternative courses of treatment — penicillin therapy or surgery. Ramos was in fact

18

treated with penicillin.  Ramos asserts in a conclusory manner, without factual support in the record, that Cleveland improperly denied him surgery on grounds that surgery, if necessary, could be obtained later at the New Hampshire State Prison if Ramos was convicted (if not convicted Ramos would of course have been able to obtain his own medical care).  Ramos offers no evidentiary support for his assertion that he lost several of his teeth because of the lack of medical care while in the Hillsborough County Jail, nor has he shown that he required additional medical treatment for his condition when he left the jail, nor has he shown that the particular course of treatment he received was in effect no treatment at all, nor has he shown that the official's decision to follow one course of medical treatment prescribed by a medical professional rather than an alternative course of treatment amounted to "deliberate indifference" to his serious medical needs.

In essence, Ramos merely challenges the degree, quality, and type of medical care he received, and perhaps even implicitly suggests he was the victim of medical malpractice in some manner, but he has not shown that Cleveland or Desmarais were <u>deliberately</u> <u>indifferent</u> to his medical needs, or that he was denied medical care.  The record, of course, shows that he was provided with medical consultations by trained professionals and

19

that jail officials provided Ramos with the medical treatment prescribed by those professionals.

In 1986 and 1987, it was clearly established that an inmate was not constitutionally entitled to the <u>best</u> medical treatment or to the medical treatment of his choice. <u>See</u> <u>Miranda v. Munoz</u>, 770 F.2d 255, 259 (1st Cir. 1985); <u>Ferranti v. Moran</u>, 618 F.2d 888, 890-91 (1st Cir. 1980). As Ramos has not shown that the treatment he actually received was so deficient or clearly inadequate that a reasonable nurse and jail director in the defendants' positions would have recognized that their actions amounted to violations of Ramos's clearly established constitutional rights to medical care, the defendants cannot be held liable, even if Ramos's constitutional rights had been violated (which he has not shown), because these defendants are entitled to qualified immunity. <u>See</u> <u>Layne v. Vinzant</u>, 657 F.2d 468, 474 (1st Cir. 1981).

Defendants Cleveland and Desmarais are entitled to qualified immunity from liability on Ramos's claims against them, and for that reason summary judgment is granted in their favor.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (document no. 64) is denied as to defendants LeBlanc and

20

Lemieux, although the claim against Lemieux is limited to whether his use of force was excessive after Ramos was removed from the bars and physically forced into his cell.  The court's rejection of defendants' qualified immunity defense is, at this stage, a "fact based" determination.  <u>See, e.g.</u>, <u>Johnson v. Jones</u>, 115 S.Ct. 2151, 2156-58 (1995); <u>Carter</u>, 68 F.3d at 13.  Summary judgment is granted as to defendants Cleveland and Desmarais.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 21, 1997

cc:  Carolyn M. Kirby, Esq.
     Jesus Ramos, pro se