United States Court of Appeals
For the First Circuit


No. 96-1623

DOUGLAS E. YEO, Individually and on Behalf of His Children and as
Chairman of the Lexington Parents Information Network,

Plaintiff, Appellant,

v.

Town of LEXINGTON, Jeffrey Young, Superintendent, David Wilson,
Principal, Samuel Kafrissen, Karen Mechem and Joseph Dini, Chairman,
John Oberteuffer, Lois Coit, Susan Elberger and Barrie Peltz,
Individually and as They Are Members of the Lexington School
Committee,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Bownes, Senior Circuit Judge, 
Selya, Boudin, Stahl, and Lynch,
Circuit Judges. 



John W. Spillane, with whom John J. Spillane and Gregory D. Smith 
were on brief for appellant.

Adam P. Forman, with whom Lois Brommer Duguette, Sarah A. 
Olivier, and Testa, Hurwitz & Thibeault, LLP were on brief for 
appellees.

S. Mark Goodman, Michale C. Heistand, Robert A. Bertsche, and 
Hill & Barlow for the Student Press Law Center, National Scholastic 
Press Association, Journalism Education Association, Scholastic
Journalism Division of the Association for Education in Journalism and
Mass Communication, Columbia Scholastic Press Advisers Association,
New England Scholastic Press Association, and Yankee Press Education
Network; Dwight G. Duncan for the Massachusetts Family Institute; 
James C. Heigham, and Choate, Hall & Stewart for Massachusetts 
Newspaper Publishers Association; Gwendolyn H. Gregory, Melinda L. 
Selbee, Timothy B. Dyk, John Bukey, Jones, Day, Reavis & Pogue for the 
National School Boards Association, Illinois Association of School
Boards, and California School Boards Association's Educational Legal
Alliance; Michael J. Long, Rosann DiPietro, and Long & Long for the 
Massachusetts Association of School Superintendents, on briefs amici
curiae.



December 9, 1997


OPINION EN BANC


-2-

LYNCH, Circuit Judge. This case, involving speech LYNCH, Circuit Judge. 

interests on both sides, arises from the decision of two

public high school student publications -- the newspaper and

yearbook -- not to publish an advertisement. The

advertisement promoted sexual abstinence and was proffered by

a parent, Douglas Yeo, in the aftermath of a decision by the

Lexington, Massachusetts School Committee to make condoms

available to students as a public health matter. Yeo had

campaigned against the condom distribution policy and lost.

The two high school student publications declined to publish

the advertisement on the grounds that each had a policy,

albeit unwritten, of not running political or advocacy

advertisements.

The civil rights action brought by Yeo against the

Town, the School Committee, Superintendent and school

officials was terminated on defendants' motion for summary

judgment. The district court judge concluded that no state

action had been shown. A panel of this court, this judge

dissenting, reversed, holding that summary judgment should be

entered for Yeo on his claims that there was state action,

that each student publication was a public forum, and that

the decisions not to publish were impermissible view point

discrimination. 1997 WL 292173 (1st Cir. June 6, 1997).

-3-

This court granted en banc review1 and withdrew the panel

opinion. The en banc court now affirms the decision of the

district court entering summary judgment for defendants on

the ground that state action has not been shown.

I. The Facts

We review the facts in the light most favorable to

Yeo, the party opposing summary judgment, drawing all

reasonable inferences from the record in his favor. Swain v. 

Spinney, 117 F.3d 1, 2 (1st Cir. 1997). 

A. The Publications 

This case involves two distinct Lexington High

School (LHS) student publications, the LHS Yearbook and the

LHS Musket. The Yearbook was operated entirely by a staff of 

about sixty students; all editorial, business, and staffing

decisions were made by students. During the 1993-94 academic

year, this staff was headed by two co-editors-in-chief, Dow-

Chung Chi and Natalie Berger. Karen Mechem, a LHS teacher,

 

1. The court acknowledges the assistance provided in the
briefs amici curiae filed by the: National School Boards
Association, Illinois Association of School Boards, and
California School Boards Association's Educational Legal
Alliance; Massachusetts Newspaper Publishers Association;
Massachusetts Family Institute; Massachusetts Association of
School Superintendents; Student Press Law Center, National
Scholastic Press Association, Journalism Education
Association, Scholastic Journalism Division of the
Association for Education in Journalism and Mass
Communication, Columbia Scholastic Press Advisers
Association, New England Scholastic Press Association, and
Yankee Press Education Network.

-4-

was the Yearbook faculty advisor. Mechem was paid a stipend

of less than $2,000 for that activity. Apart from Mechem's

stipend and the use of LHS buildings and facilities, the

Yearbook is financially independent from the school and is

funded entirely through the sale of the books to students and

advertising.

Like most yearbooks, the LHS Yearbook included

pictures of seniors and other students, sections on sports,

academics, and activities, and an advertisement section.

This advertisement section was largely comprised of

congratulatory or commemorative ads purchased by students and

their families. As the Yearbook advertising order form

suggested, student ads might include "[b]aby pictures, group

photos taken in the setting of your choice, [or] pictures of

meaningful people and/or places." A few advertisements were

also sold to local businesses; most of these included

congratulatory messages to the graduating class.

During the 1993-94 academic year, the Yearbook's

unwritten policy was to publish advertisements from those

local businesses which the students frequented or had some

relationship with during their high school years. In keeping

with this policy, students selling ads targeted those

businesses that fit the Yearbook theme of fond memories. The

Yearbook's policy was not to publish any political or

advocacy advertising, including ads from candidates for

-5-

student government.2 The purposes of this policy were to

ensure that the advertising section of the Yearbook was

congruent with the rest of the publication and to prevent the

Yearbook from becoming a bulletin board for competing issue

groups or candidates in a way that would interfere with the

commemorative purpose of the Yearbook.

The LHS Musket is a student-written and edited 

newspaper that is published four or five times a year. All

editorial, operational, and staffing decisions are made by

the student editors. During the 1993-94 academic year, Ivan

Chan served as the Musket's editor-in-chief, Dong Shen was 

the business manager, and Samuel Kafrissen was the faculty

advisor. Students do not seek or obtain the approval of the

faculty advisor for any editorial or operational decisions.

Kafrissen is paid a stipend of $1,373 by LHS, and the Musket 

receives about $4,500 a year from the School Committee. The

Musket has no physical facilities at LHS, other than a mail 

box; all the layout is done at editors' homes. The Musket 
 

2. The record does not reveal whether political or advocacy
advertising other than the ad giving rise to this litigation
was ever submitted to the Yearbook or the Musket. However, 
those affiliated with the Yearbook and the Musket believe 
that neither has ever published a political or advocacy
message or accepted an advertisement from a political or
advocacy organization. Yeo offers no evidence to the
contrary, and the record, which contains the advertising
sections of several Yearbooks, bears out defendants'
description of the types of congratulatory advertising
printed. No evidence was produced that the Musket had ever 
printed a political or advocacy advertisement.

-6-

typically includes news articles about the high school,

features, editorials, letters to the editor, sports coverage,

and humor columns, all written, edited, and produced by

students. The Musket is described in literature distributed 

to the student body as being a "student run newspaper" which

is "written, edited and distributed by students." The

editorial page bears a legend stating expressly that the

opinions stated there are those of the student editors or

newspaper staff and not of school policy.

Not every issue of the Musket contains advertising. 

Those that do contain two or three small ads from businesses

that cater to student tastes. During the 1990s, those

advertisers have included a bookstore, a video store, a music

store, a driving school, a deli, a hair salon, SAT prep

courses, and, around prom time, a tuxedo rental store and a

dress shop. For the 1993-94 school year, the Musket created 

an "Advertisement Form" for potential advertisers. The form

stated that: "The award winning Lexington High School student

newspaper provides area businesses and non-profit

organizations the opportunity to place advertisements in the

Musket." The form did not state that ads were subject to 

editorial approval, although it did note that, depending on

the issue, ad size might have to be adjusted and ads might

have to be edited, by the paper's staff, for length. The

-7-

form also stated that "[p]ayment . . . for an ad will occur

only if and after we publish an ad." (emphasis added). 

Pursuant to an unwritten policy, the Musket has 

never accepted advocacy or political advertising, including

that from candidates for student government. The purpose of

this policy was to prevent the Musket from becoming a 

"bulletin board" for warring political ideas. The students

also rejected the idea of allowing cigarette ads in the paper

for fear that such advertising would be read as an

endorsement of smoking.

B. Yeo's Submission of Advertisements 

In 1992, the Lexington School Committee adopted a

policy making condoms available to students at LHS without

parental permission. This measure was the subject of

political controversy in Lexington, and Douglas Yeo, a town

resident and parent, emerged as a leading opponent of condom

distribution and other "safe sex" policies. Yeo headed a

group called "Lexington Citizens for Responsible School

Policy," which sponsored a non-binding town-wide referendum

on the School Committee's condom policy.

The Musket ran both news articles and editorials on 

the policy and the referendum. Yeo thought these articles

misrepresented his group's position. In January 1993, Yeo

requested a meeting with LHS Principal David Wilson

concerning his grievance. Wilson suggested that Yeo submit a

-8-

letter to the editor correcting the alleged inaccuracies, but

advised Yeo that any decisions regarding corrections would

have to be made by the student editors. Yeo did not contact

the student editors. In March 1993, the voters of Lexington

approved the condom distribution policy. 

Subsequently, in May 1993, Yeo founded the

Lexington Parents Information Network ("LEXNET"). LEXNET's

stated goal was to distribute information about public

education to parents via newsletters and meetings.

1. The Yearbook Ad 

On November 1, 1993, Yeo, as Chairman of LEXNET,

submitted a full page ad to the 1994 LHS Yearbook. The ad

copy read:

We know you can do it!
ABSTINENCE: The Healthy Choice
Sponsored by: Lexington Parents Information Network(LEXNET)
Post Office Box 513, Lexington Massachusetts 02173.

The ad was accompanied by a check for $200.00. 

Mechem, the Yearbook advisor, acknowledged receipt

of the check and placed the ad in a drawer without giving it

a second thought. In keeping with Yearbook procedures, the

LEXNET ad was "warehoused" in a drawer with other ads pending

submission to the publisher for the printing of proofs.

Natalie Berger, a senior and co-editor-in-chief, noticed the

ad in the drawer and felt that the ad was "out of context"

with the advertising section of the Yearbook. However, she

-9-

decided to postpone a publication decision until she saw the

ad in proof form, which was typically when critical editorial

decisions were made.

In January 1994, a large number of proofs,

including those of Yeo's ad, came back from the printer. All

the student editors attended an editorial meeting at which

they looked over the various ads and copy. After much

discussion, the editors decided that Yeo's ad was a political

advocacy statement that was out of context with the rest of

the Yearbook and that had no place in that publication.

Although the students decided to reject the ad as drafted,

they still wished to include a message from LEXNET if the ad

could be rewritten to conform with the rest of the Yearbook.

The students did not consult with Mechem or any other member

of the faculty or administration prior to making this

decision.

The Yearbook editors asked Mechem to notify Yeo of

their decision. The students also asked Mechem to convey

their request that Yeo's ad be revised to express a

congratulatory graduation message. On February 1, 1994,

Mechem called Yeo, and told him that the students would like

to have the ad rewritten. Yeo refused to revise the ad and

threatened to sue the Yearbook unless his ad was published as

submitted.

-10-

The student editors discussed the issue again, and

decided to stand by their original decision to reject Yeo's

ad. They asked Mechem to write to Yeo, returning his check.

On February 4, Mechem wrote to Yeo:

Because of the non-controversial nature
of the advertising section of the
yearbook, we have decided not to print
the advertising you have submitted.
Please accept my apologies for the
inconvenience that our reviewing
procedure may have caused.

A $200 check was enclosed. Mechem told Principal Wilson

about Yeo's ad and the students' decision to reject it.

Yeo replied by fax on February 13, 1994, writing:

Based on our understanding of the right
of equal access and free speech, we do
not accept your rejection of our ad and
ask that you reconsider your decision to
censor it. We will not be cashing your
check at this time.
Should you not reverse your decision,
we will avail ourselves of every possible
avenue open to us in order to protect our
rights as advertisers.

2. The Musket Ad 

On January 3, 1994, Yeo wrote to Dong Shen, a

senior and the business manager of the Musket, requesting 

information about advertising procedures and rates. The

letter was not on LEXNET stationary and did not identify Yeo

as a member of that group. Receiving no reply, Yeo wrote to

Shen again on January 20, requesting the information "as soon

-11-

as possible," and copying Ivan Chan, the editor-in-chief, on

the letter.

On January 25, Shen wrote to Yeo, providing the

requested information and taking full personal responsibility

for the delayed response. Shen concluded by noting, "Of

course ads are still subject to the approval of the editorial

board."

On February 1, 1994, Yeo submitted an ad to the

Musket. The text was identical to the Yearbook ad previously 

submitted, except that, above LEXNET's address, it contained

the line: "For accurate information on abstinence, safer sex

and condoms, contact:[LEXNET]."

The student editors of the Musket discussed the ad 

extensively. In mid-February, they met and decided that

Yeo's ad constituted a political statement that they would

not run as a matter of policy. On February 24, 1994, Shen

wrote to Yeo:

After careful consideration of your
advertisement from LEXNET, the Musket
came to the difficult decision of not
printing it. In no way did we want to
limit your right to express your opinion,
but we could not accept a political
statement as an advertisement. Our own
advertisement policy dictates so for good
reasons. If we were to accept a
politically aligned advertisement, we at
the Musket would feel obligated to accept
other political statements that might
come our way. We do not wish to put
ourselves in such position. Ultimately
Ad space is not a public forum and for

-12-

that reason the Musket reserves the right
to select what Advertisements it chooses
to print. If you have any question feel
free to contact the Musket.

The decision was made, and the reply written, by

the student editors without consulting Kafrissen, the Musket 

faculty advisor, or requesting his, or any other adult's,

approval. In fact, Kafrissen did not even know about the

ad's submission until the time of the editorial meeting, and

did not see the ad or the students' response until after the

reply had been sent.

Sometime the next week, Principal Wilson called

Kafrissen and informed him that Lexington's Town Counsel,

Norman Cohen, had been contacted by Yeo's lawyer; the lawyer

had threatened to sue the town and the school authorities if

the ad was not run. Cohen thought that it would be best to

avoid a lawsuit and requested that the students publish Yeo's

ad. Kafrissen and Wilson agreed to look into the legal

issues in greater depth and to discuss the matter with the

students. On March 1, 1994, the student editors of the

Musket met with Kafrissen. Kafrissen informed them of Yeo's 

actions. Although a number of students at the March 1

meeting supported Yeo's pro-abstinence views, they were

concerned that the Musket might turn into a bulletin board 

for advocacy on lifestyle issues. Additionally, the students

were uncomfortable with having to run an ad because someone

-13-

had threatened to sue them if they did not. The editors once

again decided to reject the ad. They asked Kafrissen to

contact Yeo and to invite him to present his views in a

"letter to the editor." 

Kafrissen, on behalf of the Musket, wrote to Yeo 

that day. In the letter, Kafrissen suggested that Yeo write

a letter to the editor:

We have long considered the Letters to
the Editor section of the Musket to be a
public forum. Historically we have
accepted and printed on these pages any
and all "short and tasteful" letters that
have come to us. We would welcome such a
letter from your organization in which
you would probably be able to explicate
your position on abstinence more fully
than you would be able to in an ad
format. We have heard that you feel that
school publications have prevented you
from presenting your message to the
student body. Therefore we suggest that
you use the medium of a letter to get
your message across in greater detail,
and without charge. 

The letter concluded by noting that, if Yeo were successful

in forcing the Musket to print the ad, this would have the 

negative consequence of removing editorial control from the

student staff.

Yeo declined the offer on March 7 in a letter to

Kafrissen. In that letter, Yeo explained that his

organization decided to sponsor the ads for two reasons: 

Firstly, we had a simple message we
wanted to get out that would affirm
abstinent students in the LHS community.

-14-

. . . There is nothing controversial or
political in our message. Secondly, I
wanted to see if the Musket and Yearbook 
would react as I thought they would.
They did. In spades.

Accordingly, Yeo declined to write a letter to the editor,

which, he felt, could not make the point as concisely as an

ad could. Yeo insisted that the ad be run as submitted, "as

is our legal right," and concluded, "You don't have to agree

with it. You don't even have to like it. You just have to

print it. Touch ."

C. The Administration's Response and the Students' Decisions 

On March 1, Yeo met with Principal Wilson to

discuss the ads. Yeo believes that, at that meeting, Wilson

assured him that the ads would be printed, and told him that

the Town Attorney had advised publication. 

Meanwhile, as the controversy heightened, the

students and faculty alike were seeking advice from various

sources. Mechem told Wilson that Dow-Chung Chi, the

Yearbook's co-editor-in-chief, had asked her: "If we don't

print the ad, what law are we breaking?" In an attempt to

answer his question, Mechem talked with Wilson, Kafrissen,

and the Student Press Law Center in Washington, D.C. Several

of the student editors of the Musket and the Yearbook sought 

advice from the Student Press Law Center and the Civil

Liberties Union of Massachusetts, as well as from attorneys

they knew personally. The students were told by these

-15-

various sources that, under the federal Constitution and

Massachusetts law, student editors had the right to decide

what was printed in their publications.

On March 11, 1994, LHS officials and student

editors met in the office of the Superintendent of Schools,

Jeffrey Young. Yearbook editors-in-chief Berger and Chi,

Musket editor-in-chief Chan, advisors Kafrissen and Mechem, 

Superintendent Young and Principal Wilson attended. Young

asked questions to determine what the students' reasoning

was, and to determine that they had engaged in a thoughtful

process prior to the meeting. The administrators and faculty

were impressed with the way the students outlined the issues.

Young concluded by stating that he would like to do further

research and to obtain legal advice.

In mid-March, Musket editor-in-chief Chan was 

approached by a group of students who were offended by Yeo's

efforts and who wished to place a "counter ad" in the Musket. 

The proposed ad looked exactly like Yeo's ad except that, in

place of "Abstinence: The Healthy Choice," it read "Safe Sex:

The Healthy Choice." Chan decided to reject the counter-ad,

and informed the staff that it would not be published. 

On March 13, Chan called a meeting of the entire

Musket staff; Kafrissen was not invited and did not attend. 

At that meeting, Chan briefed the students on the events

-16-

surrounding the submission of Yeo's ad. The student staff

unanimously opposed publication of Yeo's ad.

On March 18, a second meeting was held in

Superintendent Young's office. In addition to the prior

participants, Lexington School Committee members attended.

(LHS Assistant Principal Lawrence Robinson attended in

Principal Wilson's stead). The Musket and Yearbook editors 

reiterated their refusal to run Yeo's ads. The school

officials and School Committee members warned the students of

the possible consequences of their decision, including

litigation, and described the potentially unpleasant media

exposure the students could expect. Although the students

felt that the school officials wanted them to print the ads,

the officials maintained that it was the students' decision

to make. The students were repeatedly advised that the

ultimate decision about publication of the advertisement was

theirs to make and the school administration would stand by

their decision. 

Following the March 18th meeting, Chan held several

further discussions with individuals and groups from the

Musket's staff. Finally, with the staff's support, Chan 

conclusively decided not to run Yeo's ad as a matter of

policy.

On April 11, 1994, the Superintendent again met

with the Musket staff and again told them the decision was

-17-

theirs. Throughout Young's tenure as Superintendent, the

Musket has been operated as an independent student-run

newspaper and he has never authorized any school official to

interfere with the students' decision on what to publish.

Yeo offers no evidence to the contrary.

As for the Yearbook, Chi and Berger asked Mechem to

invite Yeo, on the students' behalf, to a meeting at which

alternatives could be discussed. Yeo wrote to Mechem on

March 28, informing her that, on the advice of counsel, he

would not be able to meet with the student editors, and

requesting that all further inquiries be addressed to his

lawyer at the Rutherford Institute in Virginia.

Berger then called a meeting of all the Yearbook

section editors. Mechem attended the beginning of the

meeting and urged the students to consider the school

officials' advice. Mechem then left the meeting. The

students discussed the issues raised at the March 18 meeting.

The students reaffirmed their decision to reject Yeo's ad.

Chi and Berger then drafted a memo to Superintendent Young

and the School Committee. It concluded:

After much discussion and deliberation,
the reasons for our decision are as
follows. The nature of the
advertisement, which promotes a style of
life, regardless of the message, does not
coincide with that of the rest of the
advertisement section of the yearbook.
The inclusion of this type of
advertisement would also establish an

-18-

unsuitable precedent for the future of
the yearbook. 

This litigation followed.

During the 1994-95 school year, the new student

editors of the Yearbook decided not to accept any

advertisements other than personal notes from parents and

students. Yeo resubmitted his ad in September 1994, but it

was rejected under the new policy. The 1994-95 Musket staff 

drafted explicit "Advertisement Policies and Procedures," to

be distributed with advertisement forms, which states the

type of advertisements, including those from "political

organizations, referendum issues, advocacy groups, [and]

public service organizations,"that the Musket will not print. 

The newspaper in its news pages gave extensive

coverage to the controversy between it and Yeo, thus

providing Yeo with coverage of his pro-abstinence position.

II. Procedural History

Yeo's action under 42 U.S.C. 1983 alleges that

the refusal of the two publications to print the

advertisements violated his rights to free speech and equal

protection under the U.S. Constitution and Art. 16 of the

Massachusetts Declaration of Rights. Yeo sued the Town,

School Committee, Superintendent, Principal, and faculty

advisers but did not name the students as defendants.

-19-

The defendants moved for summary judgment on

various grounds, including, inter alia, the lack of state

action, that no public forum had been created, and qualified

immunity. Yeo opposed summary judgment, but did not submit a

statement of disputed facts in opposition to summary judgment

as required by Local Rule 56.1 of the District of

Massachusetts. Yeo conceded at his deposition that he had no

personal knowledge of the decision making processes followed

by the Yearbook and the newspaper in rejecting his

advertisement. The district court granted summary judgment

on the state action issue without reaching the other issues.

We affirm on the same ground.

III. State Action

The essential state action inquiry is whether the

government has been sufficiently involved in the challenged

actions that it can be deemed responsible for the plaintiff's

claimed injury.3 If there is no state action, then the court
 

3. The 'under color of law' requirement of 1983 "has
consistently been treated as the same thing as the 'state
action' required under the Fourteenth Amendment," United 
States v. Price, 383 U.S. 787, 794 n. 7 (1966). Indeed, the 
Supreme Court has reversed an appellate court which treated
the two analyses as separate. Lugar v. Edmonson Oil Co., 457 
U.S. 922, 924, 928, 929 (1982). This court has consistently
treated the analyses as the same. See Barrios Velazquez v. 
Asociacion de Empleados, 84 F.3d 487, 490-491 (1st Cir. 
1996). Where the statutory and constitutional inquiries are
inextricably intertwined, decision of the state action
question is hardly a breach of the obligation to decide cases
on statutory grounds in order to avoid constitutional
questions. We do not engage in a separate 1983 analysis,

-20-

may not impose constitutional obligations on (and thus

restrict the freedom of) private actors.4 

This is a situation in which the government actors

-- the school officials acting under a statute5 of the
 

nor do we reach the issue of municipal liability, under
Monell v. Department of Social Services, 436 U.S. 658 (1978), 
or of qualified immunity claimed by the individual
defendants. The district court ruling did not reach any of
these issues. Judge Stahl's concurrence suggests that we
leap over the question of state action to address a statutory
issue of causation, an unusual approach. The question
whether Yeo even has a First Amendment right to assert
depends on whether there is state action. The Supreme Court
and the circuit court cases described above have consistently
addressed the state action question before addressing
questions of causation. See also Polk County v. Dodson, 454 
U.S. 312, 325 (1981) (examining 1983 defense of no
municipal custom only after examining state action issue).
Further, courts ordinarily address questions of jurisdiction
first, and the presence of state action is "a jurisdictional
requisite for a 1983 action." Id. at 313. 

4. See, e.g., Edmonson v. Leesville Concrete Co., 500 U.S. 
614, 619-20 (1991) (discussing the relevance of the "state
action" requirement to private freedom).

5. Mass. Gen. Laws ch. 71 82 provides, in pertinent part:
The right of students to freedom of
expression in the public schools of the
commonwealth shall not be abridged,
provided that such right shall not cause
any disruption or disorder within the
school. Freedom of expression shall
include without limitation, the rights
and responsibilities of students,
collectively and individually, . . . to
write, publish and disseminate their
views . . . . No expression made by
students in the exercise of such rights
shall be deemed to be an expression of
school policy and no school officials
shall be held responsible in any civil or
criminal action for any expression made
or published by the students. 

-21-

Commonwealth of Massachusetts -- have chosen to grant

editorial autonomy to these high school students. The state

action analysis is thus placed squarely in a very complex and

changing area of law.

The modern state action decisions of the Supreme

Court do not rely on a single analytic model applied

regardless of the fact patterns involved. As this Court once

observed, the "state action inquiry is 'necessarily fact-

bound.'" Ponce v. Basketball Federation of the Commonwealth 

of Puerto Rico, 760 F.2d 375, 377 (1st Cir. 1985) (quoting 

Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982)). The 

analytic model used must take account of the specific

constitutional claim being asserted, here, one under the

First Amendment.6 Cf. Polk County v. Dodson, 454 U.S. 312 

(1981) (state action inquiry shifts depending on

 

Mass. Gen. Laws ch. 71, 82; see also Pyle v. School Comm., 
667 N.E.2d 869 (Mass. 1996) (holding that the statute
protects even vulgar speech so long as no disruption or
disorder results). We express no view on whether state law
would have permitted the school to override the students'
decisions. As we explain, the state's student speech law may
be a factor in the state action inquiry, but the issue for us
is ultimately one of federal constitutional law. 

6. The "search for state action . . . ends by identifying
the precise substantive constitutional issue to be
addressed." Tribe, American Constitutional Law 18-6, at 
1715 (2d ed. 1988). See also 1 Nahmod, Civil Rights and 
Civil Liberties Litigation: The Law of Section 1983 2.04, 
at 63 (3d ed. 1991)("[S]tate action is not a unitary concept,
but varies depending on the constitutional violation
asserted."). 

-22-

constitutional question asked). "Faithful adherence to the

'state action' requirement . . . requires careful attention

to the gravamen of the plaintiff's complaint." Blum v. 

Yaretsky, 457 U.S. 991, 1002 (1982). As the Supreme Court 

has noted:

We recognize that the First Amendment,
the terms of which apply to governmental
acts ordinarily does not itself throw
into constitutional doubt the decisions
of private citizens to permit, or to
restrict, speech -- and this is so
ordinarily even where those decisions
take place within the framework of a
regulatory regime . . . .

Denver Area Telecomm. Consortium, Inc. v. Federal 

Communications Comm'n, 116 S. Ct. 2374, 2383 (1996). 

The state action issue implicates a myriad of

players, only some of whom are defendants. Yeo sued only

those individuals who are public school administrators,

teachers, or members of the Lexington School Committee. They

are concededly state actors. He did not sue the student

editors. But the "action" of which Yeo complains was an

action taken by the students. The "actions" he assails were

the editorial judgments not to publish his advertisement.

Those judgments were made by the students, who are not

parties.

There are expressive interests involved on both

sides of this case. Yeo's are obvious. Those on the other

-23-

side are perhaps less obvious. The identification of these

interests puts the state action question in context. 

If the actions by the students are themselves state

action or may be attributed to the school officials and

provide the basis for state action, the inevitable legal

consequence will be some level of judicial scrutiny of the

students' editorial judgments.7 The inevitable practical

consequence will be greater official control of the students'

editorial judgments. Both consequences implicate the

students' First Amendment interests, which are far from

negligible. Cf. Hazelwood Sch. District v. Kuhlmeier, 484 

U.S. 260 (1988) (acknowledging but ruling against student

speech interests when school officials overrode students'

editorial judgments and withdrew certain material from pages

of high school newspaper); Miami Herald Publishing Co. v. 

Tornillo, 418 U.S. 241, 252 (1974) ("[I]mplementation of a 

remedy such as [government] enforced access" to pages of a

private newspaper "brings about a confrontation with the

express provisions of the First Amendment and the judicial

gloss on that Amendment developed over the years.").

 

7. We do not accept the suggestion of Judge Stahl's
concurrence that the students are private actors with respect
to reporting and editorializing and that they are not with
respect to the advertising decisions. Whatever role such a
distinction may play in a limited public forum analysis, the
distinction offers little assistance here.

-24-

In addition, the defendant school officials

themselves have an interest in their autonomy to make

educational decisions. The officials have determined that

the best way to teach journalism skills is to respect in the

students' editorial judgments a degree of autonomy similar to

that exercised by professional journalists. That choice by

the officials parallels the allocation of responsibility for

editorial judgments made by the First Amendment itself. The

Supreme Court has "oft expressed [the] view that the

education of the Nation's youth is primarily the

responsibility of parents, teachers, and state and local

school officials, and not of federal judges." Hazelwood, 484 

U.S. at 272.

The leading Supreme Court decisions concerning high

schools and students are all meaningfully different from this

case, and thus provide little guidance on the state action

question. Each of those cases involved a claim by students

that the actions of public school administrators violated

their constitutional rights. For example, in Hazelwood, 

plaintiff students contended that officials violated the

First Amendment by deleting articles from student newspaper.

State action was simply not at issue in Hazelwood because the 

-25-

relevant actions were admittedly taken by public school

officials.8 Id., 484 U.S. at 264. The same is true of 

earlier decisions, all of which involve student claims

against those running the schools. Bethel Sch. Dist. v. 

Fraser, 478 U.S. 675 (1986)(civil rights claim by student 

disciplined by officials for language used in school

assembly); Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 

503 (1969)(student claim that principals' regulation against

armbands violated First Amendment); see also Vernonia Sch. 

Dist. v. Acton, 515 U.S. 646 (1995)(student Fourth Amendment 

claim against school district). Here, in contrast, the

question is whether the actions by students may fairly lead 

to a conclusion there is state action.

Each court of appeals which has considered the

state action requirement in the context of attempts to

attribute student-controlled editorial decisions in public

institutions of higher education to public officials has

found no state action. In Leeds v. Meltz, 85 F.3d 51 (2d 

Cir. 1996), the court found no state action where school

 

8. Thus, when the Supreme Court in Hazelwood discusses 
whether "school-sponsored publications that students,
parents, and members of the public might reasonably perceive
to bear the imprimatur of the school," 484 U.S. at 271, that
discussion was pertinent to whether there was an intent to
create a public forum. Hazelwood did not create a new state 
action analysis that any school sponsored activity which
bears an imprimatur of the school thus constitutes state
action. 

-26-

officials and students were sued over the decision by student

editors of a newspaper in a state supported law school to

reject an ad. See id. at 55. In Sinn v. The Daily 

Nebraskan, 829 F.2d 662, 665 (8th Cir. 1987), the court held 

that there was no state action in the refusal to print an ad

where the student paper "maintains its editorial freedom from

the state." In Mississippi Gay Alliance v. Goudelock, 536 

F.2d 1073, 1075 (5th Cir. 1976), a similar result was reached

in a suit against the newspaper editor where the students

elected the editor and university officials did not control

or supervise editorial judgment about what to publish. In

Avins v. Rutgers, 385 F.2d 151, 153-54 (3d Cir. 1967), 

without expressly discussing the state action issue, the

court held that a state-supported law review's rejection of

an article did not violate the First Amendment because

editorial discretion is a necessary component of publishing a

journal. Yeo argues that cases involving public universities

are not on point, given the state's potentially greater role

in controlling the behavior of younger, high school students.

But it is also true that the autonomy given to these high

school students renders them more like their older

counterparts and renders those cases highly relevant. 

The only decisions we have found which assume there

is state action do so where the parties agreed there was

state action and it was undeniable the decision makers were

-27-

government officials. The decision by the Ninth Circuit in

Planned Parenthood of Southern Nevada Inc. v. Clark County 

School District, 941 F.2d 817 (9th Cir. 1991), is inapposite 

as state action was conceded. There the school officials

themselves controlled the school publications and decided to

reject the advertisement from the plaintiff organization.

Id. at 820. Likewise, in Lee v. Board of Regents, 441 F.2d 

1257 (7th Cir. 1971), state action was conceded where the

student newspaper was a "state facility".

While all parties appropriately point us toward the

state action analysis in Rendell-Baker v. Kohn, 457 U.S. 830 

(1982), that case is rather the mirror of this. Rendell- 

Baker involved a claim that private school officials were 

state actors. Here the claim is that public school officials

may be sued based on the actions of students. The students

are themselves at least facially private actors.

The theories for (and against) state action

basically devolve here into three categories of analysis.

First, is there state action because the decisions not to

publish were actually made by or controlled by the school

officials? (Even if the decisions were not directly made by

the school officials, those officials, Yeo argues, exerted

such influence as effectively to determine the outcome of the

student decisions.) This is primarily a factual question. 

-28-

Second, even if the state did not actively direct

or control the decisions, was the state required to

intervene, and to do so in such a way as to provide a basis

for a state action finding? This is primarily an issue of

law. 

Third, even if the decisions were made

independently by the students, may the decisions of the

students fairly be attributable to the school officials

because of the public school setting? The material facts are

undisputed; the question is what conclusion to draw from

these facts. We take each argument in turn.

A.

Yeo argues that the decisions were made or

controlled in fact by the school officials, but the record

does not support that conclusion.9 The students and each of
 

9. Yeo calls our attention to the fact that the advisors
authored some of the correspondence, using the term "we," and
to the fact that, on a separate occasion, Kafrissen
threatened to resign if the students did not take his advice.
It is true that Kafrissen and Mechem used the word "we" in
letters to Yeo. However, the letter from Kafrissen was
written after Dong Shen had already communicated the 
students' rejection of the ad to Yeo. As for Mechem's
correspondence, Mechem and the Yearbook editor both stated
unequivocally that the decision was made by the students
prior to consultation with Mechem, and that Mechem wrote to
Yeo at the student editors' request. As to Kafrissen's
threat to resign, the incident only serves to illustrate that
Kafrissen did not believe he had the authority to order the
students around. His actual description of the incident is
as follows:

-29-

the involved school officials say that the students, and not

the school officials, made the decision. Yeo has offered

nothing to contradict that.

Nonetheless, the state action cases recognize that

government should not be shielded when it is the real actor

behind the scenes or when it joins in a charade designed to

evade constitutional prohibitions. See Terry v. Adams, 345 

U.S. 461 (1953)(Democratic Party "club" was a state actor

designed to evade constitutional prohibition against all-

white primaries); cf. Morse v. Republican Party of Virginia, 

116 S. Ct. 1186 (1996). That is not true here. This is also

not an instance in which the government knowingly profits

from the racially discriminatory behavior of a privately
 

I have never ordered (nor do I have the authority
to order) the student editors not to run an
editorial, news or feature article or any
advertisement. I have used persuasion to address
matters that seemed over-the-line. On one
occasion, for example, when I disagreed strongly
with a proposed student editorial, which, in my
opinion, took an extremely irresponsible position,
I was prepared to resign if my advice to withdraw
the editorial was not accepted. The editors
engaged in an extensive debate and consulted with
their parents before finally agreeing to withdraw
the editorial.
There is nothing in the record even to suggest that Kafrissen
engaged in such persuasive techniques with regard to the Yeo
ad; rather, the uncontradicted evidence is that Kafrissen
took prophylactic measures to ensure that the students felt
free to make their own decision. At bottom, Yeo's claim of
control amount to no more than "conclusory allegations,
improbable inferences, and unsupported allegations." Fennell 
v. First Step Designs, Ltd., 83 F.3d 526, 536 (1st Cir. 1996) 
(citations and internal quotation marks omitted).

-30-

owned enterprise. See, e.g., Burton v. Wilmington Parking 

Auth., 365 U.S. 715 (1961); Blum, 467 U.S. at 1010-11. That 

type of symbiotic relationship has been found to create state

action where the government tacitly endorses and becomes

entangled with private racial discrimination. Burton, 365 

U.S. at 724. Even if that race discrimination model for

state action were imported here, there is no evidence the

school officials tacitly endorsed or benefitted from the

students' decisions not to run Yeo's ads. 

The state action cases also consider "de-

privatizing" and attributing to the government the actions of

private persons where the state has been involved in the

sense of delegating traditional governmental authority to a

private actor.10 In Edmonson, a private litigant's race- 

based exercise of peremptory challenges was found to be state

action. Edmonson, 500 U.S. at 621. The running of trials is 

a government function and it is the judge who, based on the

challenge, excuses the juror. The publishing of a newspaper

or a yearbook is most emphatically not a traditional function

 

10. The school officials point to NCAA v. Tarkanian, 488 
U.S. 179 (1988), where an unincorporated association of
public and private colleges was found not to be a state actor
even though the association's actions led a public college to
take disciplinary action against a basketball coach. But in
this case the state actors, the adults, have a supervisory
relationship to the private group, the students, and are thus
somewhat the inverse of the NCAA and the public college. 

-31-

nor an exclusive prerogative of the government in this

country. Private schools commonly have student newspapers,

and public schools not uncommonly have independent student

newspapers. The delegation of governmental function theory

does not establish state action. See Flagg Bros., Inc. v. 

Brooks, 436 U.S. 149 (1978) (sale of goods in storage by 

warehouseman did not constitute state action); Jackson v. 

Metropolitan Edison Co., 419 U.S. 345 (1974) (private utility 

which terminated electric service was not state actor). 

B.

Secondly, while there may be rare occasions when a

state has a duty to intervene in actions taken by private

persons which could give rise to a state action finding, this

is not one.11 See Ponce, 760 F.2d at 379-80 (although there 

may be some occasions in which "[t]he government should be

responsible for failing to act where it should act," there

was no state action because the government had no affirmative

duty to regulate amateur sports leagues). Cf. DeShaney v. 

Winnebago County Dep't of Social Services, 489 U.S. 189 

(1989) (finding that the Due Process Clause imposes no

affirmative duty on the government to protect citizens from

deprivation of life, liberty or property by private actors).
 

11. For example, state officials could not personally stand
by and watch privately-contracted-for prison guards beat a
prisoner to death, and then defend on the ground of no state
action.

-32-

Here, the state statute, Mass. Gen. Laws ch. 71, 82,

appears to have been intended, in part, to express

Massachusetts' policy judgment that student editors of high

school publications generally have editorial autonomy from

school officials and that their decisions are not state

action. While the state statute cannot be determinative of

the outcome of the federal constitutional question, Lebron v. 

National R.R. Passenger Corp., 115 S. Ct. 961, 971 (1995) 

(statutory declaration that Amtrak is not a government entity

not dispositive of governmental action question where

constitutional rights are involved), no such duty to act is

imposed by state law.

The First Amendment free speech and free press

guarantees do not involve a duty by the government to act

where there is otherwise no state action. Indeed, those

guarantees are largely based on prohibitions against

government action.12 "The First Amendment does not reach

acts of private parties in every instance where the

[government] has merely permitted or failed to prohibit such

acts." CBS v. Democratic Nat'l Comm., 412 U.S. 94, 119 

(1973) (plurality opinion). In CBS, a plurality of the 
 

12. The state action question also cannot be resolved
against Yeo on the grounds that the Constitution prohibits
the state actors, the school administrators, from acting to
interfere with the student editors. Hazelwood forecloses 
such a conclusion. 

-33-

Supreme Court found that the decisions of broadcasters not

to accept any editorial advertising were not government

action for purposes of the First Amendment, even though the

government both licensed and heavily regulated the

broadcasters. Id. at 116-19. As a matter of law, we see no 

legal duty here on the part of school administrators to

control the content of the editorial judgments of student

editors of publications. Such a duty -- which Yeo in his

briefing suggested could be derived from the traditional

government function of running schools and the "symbiotic

relationship" between the publications and the school -- does

not exist and cannot support state action.

C.

We are left with the third theory: that the

actions by the students should be attributed to the school

officials, despite the officials' lack of actual or effective

control and the lack of any duty. The key issue is whether

the conduct may be "fairly attributable to the state."

Barrios v. AEELA, 84 F.3d 487, 491 (1st Cir. 1996) (citations 

and internal quotation marks omitted) (no state action where

state did not compel organization of governmental employees

of Puerto Rico to act, no traditional government function

involved, and no interdependence and joint participation with

state is shown). 

-34-

Of course, the fact that the newspaper editors are

public school students does not, in itself, make them state

actors. Persons do not become state actors because they are

clients of government services, whether they are students,

hospital patients, or prison inmates. Some, like the

students, are government clients by compulsion -- here, the

truancy and mandatory education laws compel the students'

attendance.13 They may not be converted to the status of

government actors simply on such a basis. 

Yeo argues, using the Rendell-Baker terminology, 

that there is a sufficient nexus to attribute the students'

actions to the state. But examining the nexus here between

state regulation and financial support of the publications

and the challenged decisions militates against a state action

finding. See Blum v. Yaretsky, 457 U.S. at 1004; Rendell- 

Baker, 457 U.S. at 838-41. It is established that a private 

institution's receipt of state funding does not render that

institution's decisions state action. Rendell-Baker, 457 

U.S. at 840. This can be so even when the institution's

budget is almost entirely derived from public money. Id. 

Here, the publications are the institutions at issue. 
 

13. We distinguish those 1983 cases where the plaintiff is
himself a compulsory client of the government, such as is
true in suits by persons in custodial care of the state, and
sues otherwise private actors who provide services under
contract with the state. See West v. Atkins, 487 U.S. 42 
(1988); Miranda v. Munoz, 770 F.2d 255 (1st Cir. 1985). 

-35-

The Yearbook receives no money from the school

system other than the indirect assistance it gets from the

small stipend received by its faculty advisor. The Musket 

does receive greater financial assistance. Much of its

operating costs as well as its advisor's stipend are paid by

the school system. However, these facts are far from

conclusive. The focus in Rendell-Baker was on the interplay 

between the action at issue and the state funding and

regulation, not merely on the amount of state aid or

oversight. Id. There was no interplay between the decision 

not to publish the advertisement and the state's provision of

financial and faculty support. That the principal kept the

checkbook for the school newspaper had nothing to do with the

students' decisions whether or not to run the ads. 

Yeo's "nexus" argument turns on context. The

Yearbook does memorialize in photographs the experiences and

personalities in a public high school class. The newspaper

is the newspaper of the public high school; its name is the

"Lexington High School Musket" and it identifies itself with 

the high school in its communications and interactions with

other students and the community. It does receive some

financial support from the school and the faculty advisors

may have some subtle influence. The newspaper exists in the

form it does because the school authorities and state law

permit it to do so. While not part of the for-credit

-36-

educational curriculum, work on the Musket does have explicit 

educational value and provides an attractive credential for

students. The student editors perform some of their

functions on school grounds, perhaps even during school

hours. All of these factors support Yeo's argument. It is a

close question whether the injury caused here "is aggravated

in a unique way by the incidents of government authority."

Edmonson, 500 U.S. at 622 (citation omitted).14  

The Supreme Court has taught that the state action

question may shift depending on the context and the question

asked. A public defender is not a state actor in her

representation of a criminal defendant, even though she may

be one in the performance of other duties, such as hiring or

firing decisions. See Polk County, 454 U.S. at 324-25. Even 

acknowledging that the public defender is a state employee,

Polk County considered it important that, in the actual 

function of defending the client, the public defender's

relationship to the state was necessarily independent, and

even adversarial, and that the defender exercised independent

 

14. Cf. Marjorie Heins, Viewpoint Discrimination, 24 
Hastings Const. L.Q. 99, 159 (1996)("Public education
presents a paradoxical situation: it is government speech for
some purposes, yet also a quintessential forum for
intellectual growth [and] exploration. . . .") 

-37-

judgment in the same manner as did attorneys in the private

sector. Id. at 321-22. So too here.15 

Here, the students' relationship to the public

school officials in the exercise of their editorial judgment

was certainly independent. At times, it was close to

adversarial. The school officials gained nothing but a

lawsuit from the students' decision, and the officials might

themselves, as they told the students, have made a different

decision. It is not enough to create state action that the

decisions took place in a public school setting, that there

was some governmental funding of the publication, that

teachers were acting as advisors, and that the state actors

made an educational judgment to respect the autonomy of the

students' editorial judgment.

Where, as here, there are First Amendment interests

on both sides of the case, the analysis of whether there is

 

15. Similarly, in Edmonson, not all of the litigation 
decisions of the defendant private company were deemed to be
state action; only the race-based exercise of peremptory
challenges were. See Edmonson, 500 U.S. at 621-22. This 
was, in part, because "[r]acial bias mars the integrity of
the judicial system and prevents the idea of democratic
government from becoming a reality." Id. at 628. Where such 
interests are at stake, the acquiescence of a government
actor in the discriminatory actions of a private party may
implicate the Constitution. For example, if this were a
claim brought by a student who had been excluded from
election to the editorial board on account of her race, and
the school officials declined to intervene, the analysis
would focus on a different decision and most likely would
reach a different result. 

-38-

state action must proceed with care and caution. Because the

record establishes that the editorial judgment exercised was

the independent judgment of the student editors of both

publications, we resolve the question of state action against

Yeo.

The decision of the district court is affirmed.16

Costs are awarded to the Town of Lexington and the defendant

school officials.

Concurrences follow.

 

16. The motion to strike filed by Yeo in this court is
denied as immaterial and moot in light of the court's
opinion.

-39-

TORRUELLA, Chief Judge (Concurring). I concur with TORRUELLA, Chief Judge (Concurring). 

the majority opinion but write separately to highlight an

important issue that the majority fails to address -- the

absence of a public forum.

The regulation of speech in forums that have

traditionally been available for public expression is subject

to the highest degree of scrutiny. See Perry Educ. Ass'n v. 

Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). These 

"traditional public forums" include streets, sidewalks and

parks. Id. In order to further aid citizens' political 

discourse, the state may, from time to time, create a new

public forum for the views of the community. The regulation

of speech in these "designated" public forums is also subject

to strict scrutiny. See id. at 46. However, it is simply 

not true, as a matter of constitutional law, that each time a

state actor solicits advertising, a designated public forum

has been created by the government. See Lehman v. City of 

Shaker Heights, 418 U.S. 298 (1974) (city may solicit 

advertising for its rapid transit cars while refusing

political and public issue advertising). 

The Supreme Court has held that "[t]he government

does not create a public forum by inaction or by permitting

limited discourse, but only by intentionally opening a 

nontraditional forum for public discourse." Cornelius v. 

NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802 

-40-

(1985) (emphasis added); see also International Soc'y for 

Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680 (1992) 

(when the government opens a forum for certain types of

speech, a public forum has not been created unless the

government intended to create a forum without limitations); 

United States v. Kokinda, 497 U.S. 720, 730 (1990) (plurality 

opinion) (same); Perry, 460 U.S. at 48 (same). Therefore, 

when school newspapers and yearbooks publish advertising

alongside student articles and pictures, it cannot be said

that editors are necessarily intending to open a forum for

all public discourse. 

This Circuit has observed that "in determining

whether the government qua proprietor has designated public 

property to be a public forum, courts should be highly

deferential to the government's decisions to regulate speech"

where those decisions do not evidence viewpoint

discrimination. AIDS Action Committee of Mass. v. MBTA, 42 

F.3d 1, 9 (1st Cir. 1994). It follows that the mere absence

of a prior written policy against political and public issue

advertising should not preclude the Musket from adopting such

a policy when the need to do so becomes apparent, so long as

the paper has not established a practice of publishing such

material. See Cornelius, 473 U.S. at 802 (government's 

intent regarding a forum for speech must be gleaned from

policy and practice); Grace Bible Fellowship, Inc. v. Maine 

-41-

School Admin. Dist. No. 5, 941 F.2d 45, 47 (1st Cir. 1991) 

(same). In this case, the Musket had not published political

or public issue advertising in the past, and Yeo's request

did not obligate the paper to begin publishing such material.

When the state solicits advertising for a

nontraditional public forum, it is permitted to filter out

pure political speech. See Lehman, 418 U.S. at 303-04. 

Disallowing this filter would shut down potentially robust

activities, including many school newspapers, inhibiting the

marketplace of ideas protected by the First Amendment. See 

Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967) 

(recognizing that schools are important loci of the

"marketplace of ideas" protected by the First Amendment).

While it is true that "[t]he line between ideological and

nonideological speech is impossible to draw with accuracy,"

Lehman, 418 U.S. at 319 (1974) (Brennan, J., dissenting), 

there is no such line-drawing problem in this case. For this

additional reason, the district court must be reversed. 

-42-

Stahl, Circuit Judge, concurring in the judgment. Stahl, Circuit Judge, concurring in the judgment. 

Though I remain persuaded that, on the facts of this case,

the student editors were public actors acting under color of

state law, further examination of the record during en banc 

review leads me to conclude that this issue is not material

to our decision and that the district court properly entered

judgment in favor of defendants. I write separately for two

reasons. First, because this case is easily resolved on

statutory grounds -- lack of evidence from which a factfinder -- 

could conclude that the defendants "caused" the

constitutional violation complained of -- I believe the -- 

majority's central state action ruling to be an unfortunate

breach of the "fundamental rule of judicial restraint . . .

that [courts] will not reach constitutional questions in

advance of the necessity of deciding them." Three Affiliated 

Tribes v. Wold Engineering, P.C., 467 U.S. 138, 157 (1984). 

Second, I believe the majority's unnecessary constitutional 

ruling to be wrong on the merits.  

I. 

Defendants cannot be liable to plaintiff for

damages unless, among other things, they subjected plaintiff

to, or caused plaintiff to be subjected to, a deprivation of

federal rights. See 42 U.S.C. 1983. Because the Supreme 

Court has made it clear that 1983's causation language is

to be narrowly construed, see Monell v. New York City Dep't 

-43-

of Social Servs., 436 U.S. 658, 691-94 (1978) (interpreting 

the language of 1983 to preclude the imposition of

vicarious liability), the question here quickly reduces to

whether one or more defendants can, at the least, be seen as

having caused the rejection of the advertisements within the

narrow meaning of the statute. See id. As the majority 

notes, plaintiff has not named as defendants those persons --

the student editors of the newspaper and yearbook -- who may

most readily be seen as having directly subjected him to the

alleged deprivation of his First Amendment and equal

protection rights. Nor has plaintiff argued that the acts

and omissions for which the named defendants may most readily

be seen as responsible -- delegating decision-making

authority to the students and failing to override the

students' decisions -- caused him to be subjected to

constitutional harm. See, e.g., Febus-Rodriguez v. 

Betancourt-Lebon, 14 F.3d 87, 91-92 & n.4 (1st Cir. 1994) 

(discussing this circuit's standard for establishing

supervisory liability under 1983). As a result, no trial

is warranted unless there is a genuine issue of material fact

as to whether (1) at least one individual defendant actually

colluded with the students in the decisions to reject the

advertisements; or (2) the rejection was pursuant to a policy

or custom of the Town of Lexington. See, e.g., Board of 

County Commissioners v. Brown, 117 S. Ct. 1382, 1388 (1997) 

-44-

(reiterating that, for purposes of 1983, a municipality

causes one to be subjected to a deprivation of federal rights

only through its duly-enacted policies or widespread customs

having the force of law). In my view, there is insufficient

evidence to warrant a trial against any of the named

defendants under either of these theories.

Though I continue to disagree with the majority's

conclusion that defendants Kafrissen and Mechem did not

influence the students' decisions to reject the

advertisements, I now concur that the summary judgment record

permits only one inference: the students made the ultimate

decisions. In the end, I am constrained to agree that, in

the face of largely uncontradicted testimony to contrary

effect, Kafrissen and Mechem's use of the term "we" in

message-relaying correspondence with plaintiff, and

Kafrissen's prior threat to resign, see ante at 27 n.8, do 

not allow a determination that defendants Kafrissen or Mechem

can be held liable for the decisions made. And with respect

to the other individually-named defendants, so also do I

agree that there is no basis for concluding that they

participated in the rejections of the advertisements. Thus,

there is insufficient evidence of statutory causation for

plaintiff to proceed to trial against any of the individual

defendants. 

-45-

With respect to the Town, I agree with the

majority's conclusion that there is no basis for attributing

to it the conduct of the students. See ante Part III, 

Sections A and C. I take issue, though, with the method by

which the majority reaches its conclusion. Specifically, I

disagree with its direct (though reverse) application to this

case of those Supreme Court state action cases which look for

state action in private conduct. See generally id. 

(applying, in order, Terry v. Adams, 345 U.S. 461 (1953); 

Morse v. Republican Party of Virginia, 116 S. Ct. 1186 

(1996); Burton v. Wilmington Parking Auth., 365 U.S. 715 

(1961); Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978); 

Jackson v. Metropolitan Edison Co., 419 U.S. 345 (1974); 

Rendell-Baker v. Kohn, 457 U.S. 830 (1982); and Edmonson v. 

Leesville Concrete Co., Inc., 500 U.S. 614 (1991), to 

determine that the defendants to this lawsuit, all of whom

are public actors, are not liable for the students' conduct).

While these cases might, by analogy, shed light on what will

not be considered constitutionally tortious municipal conduct 

under 1983, see, e.g., Rendell-Baker, 457 U.S. at 840-41 

(strongly supporting an argument that neither municipal

funding nor municipal regulation of a private entity

constitutes municipal "policy" for purposes of 1983), not

one of them speaks to the question directly posed here: can

conduct by non-legislative and non-policy making actors be

-46-

deemed to have been sufficiently caused by municipal policy

or custom for liability to attach to the Town? Nor does any 

one of these cases involve harm-causing conduct which can be

seen as having been committed by public actors. For these 

reasons, I fear that the majority opinion confuses more than

it clarifies.

Moreover, the majority has entered an area it could

and should avoid. The Town's freedom from liability flows

less from the fact (if it be fact, see infra Part II) that 

the students are private actors than from the fact that the

students' actions were not caused by Town policy or custom. 

Again, plaintiff has not advanced as a theory of liability

the Town's decision to let the students decide -- the only

municipal policy or custom which can arguably be seen at play

here. And even if plaintiff had so argued, it seems obvious

that, as an action taken in what appears to have been good

faith reliance upon state law, see Mass. Gen. L. c. 71, 82, 

this policy cannot give rise to municipal liability under 

1983. See Surplus Store & Exchange, Inc. v. City of Delphi, 

928 F.2d 788, 791-92 (7th Cir. 1991).

In the end, defendants are entitled to judgment

because they did not, under 1983, ultimately cause the

conduct of the non-party students. We should not go beyond

this simple fact to decide the case.

II.

-47-

By resolving this dispute through application of

those cases which look for state action in private conduct,

the majority proceeds from the premise that the students were

private actors. I not only find this implicit holding to be

unnecessary, I believe it to be incorrect on the merits. In

my view, had plaintiff sued the student editors directly, we

would have been obliged to rule that they were, in fact,

public actors insofar as they solicited and published

advertisements from paying third parties.

Whether a person or entity is a private or a public

actor obviously cannot be resolved through application of

cases which presume that the actor is private; it is resolved

by a fact-specific inquiry into whether the person or entity

is, in context, acting "under color of state law." See Polk 

County v. Dodson, 454 U.S. 312, 322 n.12 (1981) (noting the 

distinction). Although the Supreme Court has sometimes

stated that the state action and under color of state law

questions are coextensive, see, e.g., United States v. Price, 

383 U.S. 787, 794 and n.7 (1966), it also has recognized that

they are not invariably the same. That the inquiries

sometimes diverge is clear in Dodson where, without reference 

to a single state action case, the Court concluded that a

state public defender does not act under color of state law

while acting as counsel to an indigent defendant in a state

criminal proceeding. 454 U.S. at 320-24. 

-48-

Here, as in Dodson, the question (had plaintiff 

raised it) would not have been whether private conduct should

be attributed to the Town; rather, it would have been whether

the conduct was, as an initial matter, public or private.

Cf. Blum v. Yaretsky, 457 U.S 991, 1003-4 (1982) (contrasting 

"those cases in which the defendant is a private party and

the question is whether his conduct has sufficiently received

the imprimatur of the State so at to make it 'state' action

for purposes of the Fourteenth Amendment" with "cases in

which the challenged conduct consists of enforcement of state

laws or regulations by state officials who are themselves

parties in the lawsuit"). And the state action tests the

majority relies upon, designed as they are to determine

whether private conduct is attributable to the state, would

not have helped answer the question.

To illustrate, when an on-duty municipal police

officer misuses the power of the office to carry out a

personal vendetta, we do not decide whether he was acting

under color of state law by reference to whether the

municipality is itself liable for the conduct. See, e.g., 

Martinez v. Colon, 54 F.3d 980 (1st Cir.), cert. denied, 116 

S. Ct. 515 (1995). We decide it on a more contextually-

appropriate inquiry into whether the officer has "exercised

power 'possessed by virtue of state law and made possible

only because the wrongdoer is clothed with the authority of

-49-

state law.'" Id. at 986 (quoting West v. Atkins, 487 U.S. 

42, 49 (1988)). So here should we decide whether the

students are public or private actors by reference to

criteria other than those we would use to decide whether the

Town must pay for the students' acts. 

What criteria should be used? A helpful starting

point is Dodson, where the Court's ruling was informed by two 

primary considerations: (1) "a public defender is not

amenable to administrative direction in the same sense as

other employees of the State," 454 U.S. at 321; and (2) "it

is the constitutional obligation of the State to respect the

professional independence of the public defenders whom it

engages," id. at 321-22. Here, both factors militate in 

favor of finding that, insofar as they solicited and

published (or declined to publish) advertisements from paying

third parties, the students acted under color of state law.

Certainly, the power of school officials to regulate the

content of student publications and the acts of their student

editors, see Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 

266-70 (1988), is near its apex where the subject of the

regulation involves the students' commercial interactions

with third parties. And where these interactions arguably

implicate the constitutional rights of those third parties,

cf. Dodson, 454 U.S. at 321-22, and hold out the prospect of 

monetary benefit to the Town, see, e.g., Burton, 365 U.S. at 

-50-

724 (indicating that conduct which leads to monetary benefits

for the State will often be deemed action on behalf of the

State), the question is less whether the students may be

regulated and more whether the students must be regulated. 

My position is narrow. I have never doubted that

the student writers are private actors with respect to

reporting and editorializing. A contrary holding would,

after all, effectively spell the end of public school student

publications; one would be hard-pressed to report and could

never editorialize without violating the First Amendment's

mandate of viewpoint neutrality. See generally R.A.V. v. 

City of St. Paul, 504 U.S. 377 (1992). I only suggest that, 

to the extent public school students solicit funds to support

a public enterprise in their capacities as officials of that

enterprise, they act under color of state law. See Dodson, 

454 U.S. at 324-25 (making clear that an actor can act under

color of state law in one capacity but not in another); see 

also ante at 35. 

At the very least, that the students are private

actors is not such an open and shut matter that it should be

assumed sub silentio. If the student editors of the Musket 

determined to run the paid political advertisements of

Democratic candidates for Town office but not those of

Republican candidates, and if the Republican candidates

sought injunctive relief against the students in their

-51-

capacities as editors of the Musket, would we summarily 

conclude that the challenged action was not undertaken under

color of state law? I would like to think not. Though the

facts of the present case are less egregious, the underlying

question -- not presented here because of plaintiff's

pleading decisions -- is the same.

III.

For the reasons stated, I concur in the majority's

conclusion that judgment was properly entered in favor of

defendants. I do not, however, concur in the reasoning that

leads it to this conclusion. I would instead resolve the

case under well settled law that precludes a finding, under 

1983, against any of the defendants named in the complaint

for the theories of recovery plaintiff has advanced. 

-52-